FOURNET, Chief Justice.
The Mississippi River "Bridge Authority, incorporated pursuant to R.S. 48:1091 et seq. and availing itself of powers therein granted by the Legislature, including the power of expropriation, filed its petition to expropriate certain property belonging to the defendant, Miss Louise Simon, femme sole, consisting of three contiguous parcels forming the corner of Camp Street and Howard Avenue in the City of New Orleans, alleging that the property was necessary in connection with the approaches to a bridge and works and appurtenances thereto being constructed by the plaintiff over the Mississippi River at New Orleans, and praying that the property be adjudicated to the State for the use and benefit of the plaintiff upon deposit in the registry of Court of an amount determined to be just compensation for damages sustained by the defendant. Following trial on the merits, where the sole question was the value of the property, there was judgment in favor of plaintiff as prayed with damages to the defendant in amount-of $70,000. The defendant appealed,[1] and the only matter presented for our determination is as to the sufficiency of the award.
The land expropriated covers an area of 16,622.683 square feet, is a quadrangle measuring 111 feet 5 inches on Camp Street by 145 feet on Howard Avenue, and *671 at the time of the expropriation was improved by three buildings; the corner area, including the entire Camp Street frontage, was occupied by a three-story brick and concrete building bearing municipal numbers 1000 through 1014 Camp Street, consisting of four stores on the street level and 22 rooms, destined for living quarters, on the second and third floors; on the land adjoining the rear and fronting on Howard Avenue, bearing municipal number 534 Howard, was a two-story brick residence; and next to that was 526 Howard Avenue, a one-story brick and frame galvanized iron building. The three-story building, through choice of the owner (an elderly lady), was unoccupied at the time of the expropriation — the corner store, suitable for use as a drug store, having been the most recently rented of the store units. The brick residence was occupied by families, the lower floor being divided into two apartments, the upstairs rooms and the slave quarters being occupied as separate units. The remaining building was rented to a tinsmith.
The testimony of the experts offered by the plaintiff and the defendant covered the comparable qualities of a number of Camp Street properties in the same and adjoining blocks which had changed ownership in recent years. In calculating a square-foot value for each parcel they took into consideration the area, frontage, location in the block, type of improvements, age and condition of the improvements, and the income derived therefrom; yet there was a marked divergence of views between the two expert appraisers who testified for the plaintiff and the two who testified for the defendant, the former estimating a value of $3.90 a square foot, or approximately $64,828, the latter a value of $6.00 a square foot, or approximately $99,736.
The trial judge, having made a personal inspection, gave written reasons in which he noted his own estimate of the value (totaling $54,000), reached by considering the properties separately as three units, assigning a value to each “if in good condition” and deducting an amount estimated as the minimum required for repairs; however, in fixing the award he accepted the estimate of plaintiff’s appraisers, i. e., $64,828, and on rehearing, “in order to allow a margin for error,” raised the amount to be paid the defendant to $70,000.
A perusal of the record shows that plaintiff’s experts, Max Derbes and E. Holland Johnson, were in agreement in their valuation of the land at $3.90 a square foot. In explaining how the said value was reached, Mr. Derbes stated [2] that due to the fact that the buildings were in bad condition and would require heavy expenditures for repair to meet present *673 day requirements, he gave no value to the improvements, being of the opinion that by treating the improvements as nonexistent he could evaluate the property as a whole piece and thus give the owner the advantage of a plottage value. In arriving at the price of $3.90 per square foot he considered the sales prices of various comparable properties in the vicinity, as affected by the fact that the corner influence of the subject property was worth an additional 10% and plottage value was also worth 10%, but -he deducted therefrom 15% for the asserted reason that the “river side” of Camp Street was less desirable than property on the opposite side because the latter forms part of the square bounded by St. Charles Avenue and Lee Circle. He considered, but refused to use as comparable, what he termed “monopoly sales” in the area because in his opinion the high prices — $7.10, $7.27, $8.00, $12.75, and up to $15.10 per square foot — paid for those properties were induced by the fact that owners who were already established in a location wished to purchase adjoining land so as to expand, or for convenient parking facilities.[3]
On the other hand, the two expert appraisers who appeared for the defendant, Cliff Probst and B. Van Pelt Biggar, calculated in separate estimates that the properties were worth in excess of $99,000. Both disagreed with the view of plaintiff’s appraisers that the other side of Camp Street had higher value; in their opinion, for business purposes the side on which the subject property was located held the advantage of being on the right side going down the one-way street. Mr. Probst arrived at a figure of $6 a square foot by considering sales of comparable property, the best example being, in his opinion, 901-911 Camp Street, a block away from defendant’s holdings — identical in area, an improved corner property (two-story single rooming houses), which was sold to the Y. M. C. A. four years previous to this expropriation for $4.92 a square foot. By using a round figure of $5.00 a square foot and allowing for an increase of 20% for property in the area during the period from 1952 to 1956, he thought the resulting $6 per square foot was amply sustained by other comparable sales in the vicinity, among these being the sale of 1051 Camp Street, in 1955, for $8 a square foot, and of the improved corner of Camp and Poeyfarre (1034 — 1040 Camp) with less area, to Mississippi Bridge Authority, for $6.94 per square foot, as well as the American Bank “assembly,” those recent purchases averaging $9.90 a square foot for inside, not corner, property. This witness thought that with the expenditure of about $1,000 *675 the properties could be placed in condition to bring $750 a month in rentals, and that the tinsmith shop, which needed no repairs, would rent for $75 per month rather than the $40 then received as monthly rental for it.
Mr. Biggar used two methods of calculation; in one he assumed a value of $4,025 a square foot for the land alone,[4] or $66,897.51, and calculated the 22,000 square' feet of improvements at $1.50 per square foot, or $33,000 — a total of $99,897.51, or a price per square foot of $6.01. By another method of appraisal, based on comparable sales, including those rejected as “monopoly sales” by the plaintiff’s experts, Biggar also estimated a valuation of $6 per square foot, or $99,736.10, and to prove the correctness of the figure he “broke down” the rental area of the property into units, calculated the income each unit would produce under proper management[5] even in its then condition (he mentioned that structurally the three-story building was very sound, being 14" brick walls against 12" brick walls) and arrived at a gross monthly rental figure usually to be expected from an investment of like amount.
As has often been stated by this Court, the best guide in determining the market value to which the owner is entitled under the law in expropriation suits is evidence of sales of similar or comparable properties in the vicinity.[6] We are not here faced with the situation, often causing serious difficulty, where there is no evidence of such sales; on the contrary, in the instant case there is almost an excess of material, since the record abounds with information concerning a large number of fairly recent sales of Camp Street properties in the immediate business district, evidencing considerable activity in the real .estate market in that area— frontage often improved with substantial *677 structures of varying age and value, rented as a rule to business enterprises. Our problem is one of evaluation, to determine ■which properties were in fact comparable, not losing sight of those transfers most recently effected directly from the owners to the plaintiff in connection with the same bridge project for which the defendant’s property was expropriated.
We are not impressed with the soundness of the opinion, expressed by plaintiff’s experts, that property on the opposite side of Camp Street from defendant’s property was more valuable by 15%; it appears to have no other basis than a comparison of' two sales in 1952, one on either side of Camp Street, in which a vacant lot on the “River side” sold for $2.75 a square foot while a vacant lot- on the opposite side sold for $3.22. Isolated instances could no doubt be found to show various “differentials” of this type, but they are not persuasive. While property lying within a square bounded on one side by St. Charles , Avenue might well have added value for some purchasers, it must also be recognized that business property on the side of the street where traffic could conveniently stop would have added value for other investors, and there is nothing in the record to warrant a hard and fast rule. Nor is there merit in the assumption that improvements'must be treated as non-existent' in order to give á tract of land the bénefit of plottage value;,' a larger tract' has additional value because of that fact alone. On the other hand, to disregard substantial improvements because they are in need of some repair is without precedent, and the fact that the owner in recent years had made no effort to keep the various units occupied or to make the properties attractive for rental purposes does not warrant a conclusion that they were worthless. We are of the iurther view that plaintiff’s experts were in error in discarding the so-called “monopoly sales” as not reflecting a price between a willing buyer and a willing seller; not only is such a conclusion unrealistic but, as shown by the record, higher prices were paid, not in one or two instances, but in numerous transactions in the vicinity.
Taking the record as a whole, assisted by photographs of the subject property and of many of the parcels considered by the experts, it is our opinion that the appraisal of the defendant’s experts of $6 a square foot is' fully warranted, and that the defendant is entitled to an award on that basis for- the total area of 16,622.683 square feet. We are fortified in this conclusion when we consider that the plaintiff paid $6.94 for improved property- occupying the same relative corner a short block away; that inside lots directly across the street brought prices ranging from $7.10 to $15.10 a square foot; and that in, the case of comparable properties which" sold a. few years' back for less, than;,$6,. the *679 recent increase in real estate value would warrant that price today.
For the reasons assigned, the judgment appealed from is amended by increasing the amount of the award to be paid defendant from $70,000 to $99,736.10, and as thus amended, it is affirmed.
HAMITER, J., recused.

. By motion filed in this Court, and on showing that Miss Louise O. Simon, de- ' fendant and appellant, died while this appeal was pending, her testamentary executor, Dr. H. Theodore Simon, was substituted as party-appellant in this cause.'

. By stipulation it was agreed that the testimony of Mr. Johnson on these matters would be tbe same as that of Mr, Derbes.

. Among examples of “monopoly sales” were acquisitions on Camp Street by the Federal Land Bank, the Y.M.C.A., Pan American Petroleum Corporation, and the American Bank.

. He stated that ground with a frontage on Camp Street was worth $3.50 per square foot, to which he added 15% for “assembly value and corner increment,” or a total of $4,025 per square foot.

. In Mr. Biggar’s opinion the Camp Street building, in its then condition, if properly managed would bring in a monthly rental of: corner drug store, $200; 1006% Camp, a barber shop, $25; 1008 and 1010 Camp, two stores, $50, and 1014 Camp, a restaurant, $75. The residence should bring in $30 each for the two lower-floor apartments; the upstairs rooms, ■ if rented to individuals at $3 per week, would produce $54,‘and the slave quarters, with like arrangement, another $35. Although he did not include the rental value of the upstairs 22 rooms and four baths in the corner building, those should, if in good condition (and on the basis of figures given him by a contractor, with the expenditure of $11,000, or $500 per room, they could be put in good condition), rent for 50$ per room per day, or $330 per month. In all, including the tinsmith’s shop, the property should produce between $870 and $950 per month.

. See Texas Pacific-Missouri Pacific Terminal R.R. v. Dittmar, 161 La. 444, 108 So. 877; City of New Orleans v. Noto, 217 La. 657, 47 So.2d 36; Rapides Parish School Board v. Nassif, 232 La. 218, 94 So.2d 40.