123 So.2d 93

STATE of Louisiana, through the DEPARTMENT OF HIGHWAYS,

v.

John McDUFFIE.

No. 44294.

June 29, 1960.

Rehearing Denied Oct. 5, 1960.

D. Ross Banister, Glenn S. Darsey, Baton Rouge, for plaintiff-appellant.

Cashio, Cashio & Molloy, Maringouin, Benton & Moseley, Baton Rouge, for defendant-appellee.

GARDINER, Justice ad hoc.

The State of Louisiana, through the Department of Highways, acting under the authority of LSA–R.S. 48:441–48:460 (Act 107 of 1954), expropriated certain property with improvements belonging to the defendant, John McDuffie, by ex parte procedure on January 30, 1957 after depositing $46,650, estimated to be just compensation for the property taken, into the registry of the court for the benefit of the persons entitled thereto. Defendant filed an answer on February 25, 1957 claiming that the deposit was inadequate compensation and that he should receive $60,000 as the value of the land taken, $21,000 for the improvements thereon, and $10,000 as severance damages to the property left to him after the taking, making a total demand of $91,-000. This demand was increased by an amendment to the answer on April 2, 1958 which asserted the land value to be $86,-500, the value of the improvements to be $14,000, and omitted the demand for severance damages, making a total demand of $100,500.

The property affected by this expropriation consists of four lots in Glen Oaks Subdivision near the city of Baton Rouge, Louisiana on Plank Road one block north of the Airline Highway. Lots 1 and 2 had

a total frontage of 196.42 feet on Plank Road by a depth on the south side of 185 feet and a depth on the north side, along Glen Oaks Avenue, of 163 feet. The sub-division restrictions permitted the use of lots 1 and 2 for commercial purposes. Plank Road is one of the main traffic arteries into Baton Rouge, having 6 lanes south of the Airline and 2 lanes to the north in front of the subject property. Lots 3A and 3 were behind lots 1 and 2 in relation to Plank Road, fronting 70 feet each on Glen Oaks Avenue by a depth of 184.81 feet. These lots were being used by the defendant for residential purposes, a dwelling with a garage and carport having been constructed on lot 3A. The defendant purchased all four lots with the house (in a less improved condition) for $16,000 in 1949 from his brother-in-law, John Sumrall. Of these four lots the plaintiff took all of lots 1 and 2, practically all of lot 3A, and a small portion of lot 3. The required right of way crossed lots 3A and 3 diagonally, leaving the defendant the equivalent of one lot, triangular in shape, fronting approximately 140 feet on Glen Oaks Avenue. It was necessary to take a portion of the dwelling, and therefore the whole house was expropriated as well as the carport and garage.

On August 1, 1955 defendant leased to Gulf Coast Oil Company the part of lots 1 and 2 fronting on Plank Road, to a depth of approximately 100 feet, leaving avail-able to the defendant for other uses approximately 63 feet across the rear of those two lots. The lease provided for a primary term of 10 years with monthly rentals of $125 for the first three years and $150 per month during the remaining 7 years. The lessee had an option to renew the lease for an additional ten years at a monthly rental of $150. The lessee was obligated to make improvements on the leased premises having a value of $20,000 within 6 months of the inception of the lease; these improvements were to become the property of the lessor upon the termination of the lease. Since the highway department purchased the lease from Gulf Coast Oil Company, it is now relevant only insofar as it affects the value of the property taken.

The deposit of $46,650 was fixed by expert real estate appraisers Lowell M. Roseman, Durward Gully, and Bradley C. Mittendorf, all of whom testified for the state during the trial on the merits, as just compensation for the property and the improvements taken. In arriving at the value of the land subject to the service station lease, these experts relied principally on the "income" method of appraising real estate under which the current income from the immovable is capitalized at the rate of return generally demanded of real estate investments in the immediate area. The three witnesses figured a rental of $150 per month or $1,800 per year, notwithstanding that the lease only provided for $125 a

month during the first three years. The annual rental of $1,800 was capitalized at 6%, the rate of return on real estate investments generally prevailing, which equals $30,000, the amount allowed for the leased portion of the land taken. No value to the defendant was placed on the $20,000 improvements which the lessee was required to make because these witnesses were of the opinion that the life of the physical assets in a service station is limited to 15 or 20 years, which would render the improvements obsolete at the termination of the lease if the lessee chose to remain in possession the full 20 years. The other part of lots 1 and 2, 63 feet in depth, was treated by the state's experts as residential property to afford a "buffer" zone between the service station and the defendant's residence even though the property was available for other commercial uses under the existing restrictions; and, accordingly, that strip of ground was appraised at $2,400. The value of the improvements on lot 3A was estimated on a square foot basis allowing $11,250 for the house, garage, and carport. $2,750 was allowed for lot 3A on the basis of the current selling price, according to the opinion of the state's witnesses, of residential lots in Glen Oaks. $250 was allowed for the small portion of lot 3 which was taken.

■ The defendant produced three realtors as expert appraisers at the trial. Two of these, W. D. McCants, Jr. and L. A. Hawkins, appraised the property taken at $97,000, basing this estimate on an offer made in 1951 by W. A. Stepp to purchase the four lots for $80,000, on two other sales of property near the subject property,[1] on the rentals from the existing lease to Gulf Coast Oil Company as well as the value to the defendant of improvements to be made by the lessee, and on an offer by Zebra Fireworks Company to lease the

1. The two sales referred to are the "Tremarco" sale, confected in May of 1957, and the "Parker" sale in November of 1957, both taking place after the date of the instant expropriation. The "Tremarco" acquisition was of a 22,089 square foot corner lot at Cannon Street and Plank Road, south of the Airline Highway, purchased for service station purposes at a price of $31,000 or $1.40 per square foot. The "Parker" sale was to the Department of Highways of 6,085 square feet near the "Tremarco" property, purchased in connection with the same highway project involved herein for $20,111.40, or $3.30 per square foot. Both sales having taken place some months after the instant expropriation became public knowledge, they are of doubtful value as comparables with which to fix the value of the defendant's property. Moreover, the "Parker" sale is not controlling because it was made to the Highway Department. It is well settled that sales to the expropriating authority made under the threat of expropriation are not the result of free bargaining between a willing seller and a willing buyer, and, while they can be considered in reaching the market value of property to be expropriated, are not controlling as comparable sales. Orleans Parish School Board v. Paternostro, 1958, 236 La. 223, 107 So.2d 451; State v. Sauls, 1958, 234 La. 241, 99 So.2d 97; and State v. Dowling, 1944, 205 La. 1061, 18 So.2d 616.

rear 63 feet of lots 1 and 2. With this data before them these two appraisers analysed the market value of the property using a combination of the "square foot" approach and the "potential usage" approach. In the later approach they anticipated $45,000 income from the lease proposed by Zebra Fireworks Company [2] on the rear 63 feet of lots 1 and 2, $40,000 from the existing Gulf Coast Oil Company lease, $15,000 for the house and lot 3A, and $4,000 for lot 3, which gave a total of $104,000 "potential usage" value to the property. In the "square foot" approach the Stepp offer and the two other above-mentioned sales were averaged to arrive at a value of $2.13 per square foot for the commercial property, and the residential lots were evaluated at $.31 per square foot. Under this approach lot 1 was appraised at $41,835.33, lot 2 at $34,393.11, lot 3A at $2,429.78, and lot 3 (the portion taken) at $669.91, which totaled $79,328.13 for the property without improvements. To this figure was added $11,000 for the house, which resulted in an estimate of $90,328.13 under the "square foot" approach. These two experts then averaged the result of the two approaches and arrived at an estimate of $97,000 market value for the property taken.

The defendant's third expert witness, Kermit Williams, estimated the property to be worth $94,650 on the basis of different factors from those used by the other witnesses. To determine the market value of the commercial property, this witness relied on sales of other property prior to the taking of the subject property. On January 30, 1956, approximately one year prior to the instant taking, Ernest Bateman sold the so-called "Foodtown" property to M. A. Tynes for $275,000. This was improved property, with a frontage of 386 feet on Plank Road by a depth of 200.93 feet on the north side and 317 on the south side, with 350 feet across the rear. Realizing that the Foodtown property was improved whereas the defendant's commercial lots were not, and that the Foodtown property was larger than the McDuffie property. Mr. Williams attempted to reduce the Foodtown sale price to comparable figures by considering the income from the Foodtown property and the cost of replacing the improvements. The owner of the Foodtown property attributed 60% of the sale price to the buildings and 40% to the land, and estimated the expected income to be $28,500 per year whereas it actually developed to be $31,000 annually. 40% of the sale price

---

2. The Zebra Fireworks Company had operated fireworks vending stands on the property prior to the Gulf Coast Oil Company lease. They had offered to lease the rear 63 feet of lots 1 and 2 to be used as a fireworks warehouse for

25 years at $250 per month if the defendant provided the building or at $150 monthly if the lessee constructed the warehouse. Negotiations on this lease were halted by the instant expropriation proceedings.

was approximately $100,000 which was considered to be the value of the Foodtown land, or approximately $271.80 per front foot. This figure apparently squared with the value attributed to the land by subtracting the replacement cost of the building located thereon from the sale price. The fact that the Foodtown property fronted on a six lane street (Plank Road south of the Airline Highway) and the McDuffie property only fronted on a two lane street (Plank Road north of the Airline Highway) was considered unimportant by Mr. Williams since local and state traffic counts allegedly revealed only a slight differential between the traffic on the two parts of Plank Road of 100 cars in a daily count of 17,000 to 18,000 vehicles. Along with the Foodtown sale, this witness also relied on a sale for $30,000 to Continental Oil Company on July 18, 1955, approximately 1½ years prior to the taking of McDuffie's property, of a commercial lot fronting 120 feet on Plank Road by a depth of 262 feet, with a dwelling on the rear part (which was subsequently sold by Continental for $15,000). The $30,000 purchase price represented a valuation of $250 per front foot. Considering these sales, as well as the growth pattern of the Glen Oaks area, this witness estimated the value of the leased portion of lot 2, a corner lot, to be $325 per front foot, or $31,950. The value of the leased portion of lot 1, an inside lot, was estimated to be $275 per front foot,

or $27,000. The remaining portion of lots 1 and 2, fronting on Glen Oaks Avenue, was considered best suited for commercial usage and was estimated to be worth $17,000. The witness did not consider the lease in evaluating lots 1 and 2 because he did not consider the lease to be the highest and best use of the land, although in view of the defendant's age he thought the lease to have been a wise use of the property. He did not rely on the two sales consummated subsequent to the taking of McDuffie's property (described herein in footnote) because at the time of those conveyances the potential of property in the area had been limited by the fact that the expropriation plans had become public knowledge.

The trial judge was of the opinion that the state's witnesses were in error in classifying the rear 63 feet of lots 1 and 2 as residential, the highest and best use of the property being commercial. He concluded that the state's witnesses erred in not considering the value to the owner of the improvements required to be made by Gulf Coast Oil Company. He also observed that the offer made by Mr. Stepp in 1951 was a bona fide offer to purchase, coupled with the ability to pay the price offered. After making those observations the trial judge concluded:

"I am of the opinion that giving consideration to the location of the property involved, the frontage on the

Plank Road, the comparable values placed upon the property which have been compared for the valuations, the testimony of all the experts both for the McDuffie's and for the State, the consideration of the $80,000.00 offer allegedly made by Mr. Stepp, that a valuation of $300 per front foot of this property on the Plank Road to include all of lots 1 and 2 is warranted, which would give a value of lots 1 and 2 of $58,926.00. Upon giving consideration to the values of the parts of lot 3-A and lot 3 which have been taken under this expropriation, I am of the opinion that a valuation of this property of $3,200 would be proper. Inasmuch as all of the experts have more or less agreed on the valuation of the improvements that value is fixed at $11,250.00, making a total of $73,376.00 as the amount of compensation to which Mr. McDuffie is entitled because of this expropriation."

There being more than $2,000 in dispute the Department of Highways appealed to this Court from the judgment of the trial court, alleging the award to be excessive and contending that the trial judge erred in the following particulars:

"1. In admitting in evidence offers to purchase for the purpose of establishing market value of the property expropriated, such evidence or offers being incompetent for that purpose.

"2. In accepting, for the purpose of establishing market value, sales of property used by the property owner's witnesses which occurred subsequent to the date of the taking, a single sale to the expropriating authority, and one sale of property wholly incomparable.

"3. In rendering a judgment which failed to give effect to the testimony of all expert witnesses and accepting that of the property owner's while, in effect, discarding the testimony of plaintiff's expert witnesses."

The defendant answered the appeal and seeks to have the award increased, arguing that the trial judge erroneously gave some weight to the estimate made by plaintiff's experts after finding them to be in error in evaluating a portion of the property taken as residential rather than commercial, in capitalizing the lease as the principal means of ascertaining the value of the leased premises, and in failing to recognize the value to the owner of the lessee's obligation to improve the leased premises. The defendant argues further that the trial judge erred in adjusting the award in view of tax advantages accruing to the land owner whose property is expropriated.

 The first issue for decision is whether or not a bona fide offer to purchase or to lease the property expropriated should be admitted as evidence relative to the

market value of the property at the time of the taking. In Louisiana Ry. & Navigation Co. v. Morere, 1906, 116 La. 997, 41 So. 236 this Court held that evidence of offers of purchase was properly rejected, such evidence being safer to reject than to receive. In view of the fact that such evidence is inherently unreliable, being highly susceptible to fabrication, and in view of the Morere case, we hold that offers to purchase or to lease, even thought found to be bona fide, are inadmissable as evidence of market value in expropriation cases and that the trial judge erred in admitting the Stepp offer and the Zebra Fireworks offer over the plaintiff's objections. It follows that the estimates made by defense witnesses McCants and Hawkins must be disregarded since those estimates are based in large measure upon those two offers.

■ The next matter for decision is the question of the correct method to be used in appraising the land under lease to Gulf Coast Oil Company. The state's witnesses relied solely on the capitalization of income method whereas the third defense witness, Mr. Williams, relied on sales in the vicinity of what he considered to be comparable property. It is well settled that where recent sales of comparable or similar property in the vicinity of the expropriation are available, these constitute the best criteria of market value of the expropriated property.[3] In this case, however, Mr. Williams relied on the Foodtown sale and the Continental Oil Company purchase, both described supra, which we do not consider to be comparables. Without again describing the Foodtown property and attempting to compare it with the subject property, it is merely necessary to observe that the reduction of the Foodtown sale price to comparable figures involves so much speculation as to render the comparison unreliable. With respect to the Continental Oil Company purchase, the record reveals that part of the property was not needed for the purpose of erecting a service station, which prompted the purchase, and was subsequently sold to a third party. It is impossible to ascertain what value or portion of the purchase price was attributed to the unneeded portion of the property at the time of the sale by the parties, and the uncertainty of this factor renders that sale undesirable as a comparable for present purposes. The only other two sales in the vicinity near to this expropriation

3. State v. Sauls, 1958, 234 La. 241, 99 So. 2d 97; Mississippi River Bridge Authority v. Curry, 1957, 232 La. 140, 94 So.2d 9; Rapides Parish School Board v. Nassif, 1957, 232 La. 218, 94 So.2d 40; Mississippi River Bridge Authority v. Simon, 1957, 232 La. 668, 95 So.2d 144; Housing Authority of New Orleans v. Boudwine, 1954, 224 La. 988, 71 So.2d 541; Housing Authority of New Orleans v. Brinkmann, 1953, 224 La. 262, 69 So. 2d 37; City of New Orleans v. Noto, 1950, 217 La. 657, 47 So.2d 36.

in point of time are described herein in footnotes. One of these is of no value as a comparable sale because it was to the expropriating authority; moreover, both are of doubtful value because they transpired after the proposed highway development for which the instant property is taken became public knowledge which doubtlessly affected the sale price. Thus it appears that there were no sales of comparable property with which to fix the value of defendant's property. This does not mean, however, that we agree with the $30,000 appraisal of the leased property based solely on the rentals stipulated in the lease. Rentals and income from the subject property are highly relevant in the absence of comparable sales in the vicinity, but they are not necessarily controlling[4] even where the property is encumbered by a long term lease. We agree with the trial judge that the state's experts erroneously failed to consider the value to the defendant of Gulf Coast Oil Company's obligation to place upon the leased premises $20,000 worth of improvements. We think that a willing buyer and a willing seller would consider the right to the improvements as having a value in arriving at a market price for the property. The only evidence in the record as to the extent to which this right enhanced the market value of the defendant's property is Mr. McCant's testimony that a conservative estimate would be $5,000. This seems to be a reasonable figure, and, in our opinion, should be added to the $30,000 estimated by the state's witnesses to be the value of the leased premises, making that portion of the property worth $35,000.

The rear 63 feet of lots 1 and 2 were appraised at $2,400 by the state's witnesses as residential property, having been relegated by them to the status of a "buffer zone" between the defendant's residence and the service station. We agree with the trial judge that the highest and best use of this property is for commercial purposes and, as such, it is worth considerably more than $2,400. Mr. Williams appraised its value for commercial purposes at $17,000 apparently basing this estimate on the allegedly comparable sales discussed supra. Considering the value placed on the front 100 feet of these lots, the fact that the rear 63 feet is relatively narrow for a commercial lot, the fact that access to this strip can be had only from a side street, and the other evidence presented, except of course that which should have been excluded, we think Mr. Williams' appraisal to be high and that $12,000 is a reasonable estimate of the market value of this 63 foot strip.

4. Mississippi River Bridge Authority v. Curry, 1957, 232 La. 140, 94 So.2d 9; Rapides Parish School Board v. Nassif, 1957, 232 La. 218, 94 So.2d 40; Louisiana Highway Commission v. Paciera, 1944, 205 La. 784, 18 So.2d 193; Housing Authority of New Orleans v. Persson, 1943, 203 La. 255, 13 So.2d 853.

Counsel for the highway department complains that the trial judge erred in placing a value of $3,200 on lot 3A. The state's witnesses definitely testified that $2,750 was the highest price being paid for residential lots in Glen Oaks at the time of the taking, but the defendant's witnesses were equally certain that residential lots in that area were worth $4,000. Under the circumstances we cannot say that the trial judge committed manifest error in awarding $3,200 as the value of lot 3A.

No serious complaint has been made concerning the award of $11,250 for the improvements taken. Consequently the judgment rendered below is amended to award $35,000 as the value of the leased portion of lots 1 and 2 and $12,000 as the value of the rear 63 feet of lots 1 and 2. The award of $3,200 for the value of the residential lots taken and the award of $11,250 for the improvements are affirmed. Thus the total amount due the defendant as the fair market value of the expropriated property is $61,450. For the reasons assigned, the judgment below will be amended so as to reduce the amount awarded the defendant to the sum of $61,450, and, as amended, the judgment will be affirmed; all costs to be assessed to the plaintiff.[5]

5. State v. Barineau, 1954, 225 La. 341, 72 So.2d 869; Housing Authority of New Orleans v. Polmer, 1956, 231 La. 452, 91 So.2d 600.