138 So.2d 597 (1962)
STATE of Louisiana, through the DEPARTMENT OF HIGHWAYS, Plaintiff and Appellant,
v.
Aubrey O. HENDERSON, Defendant and Appellee.
No. 500.
Court of Appeal of Louisiana, Third Circuit.
March 8, 1962.
*598 D. Ross Banister, Glenn S. Darsey, Brunswig Sholars, and Chester E. Martin, by Chester E. Martin, Baton Rouge, for plaintiff-appellant.
Bean & Rush, by James W. Bean and Warren D. Rush, Lafayette, for appellee.
Before CULPEPPER, SAVOY and HOOD, JJ.
CULPEPPER, Judge.
This suit was filed under the provisions of LSA-R.S. 48:441-48:460 providing for expropriation by a declaration of taking. Portions of defendant's land and improvements near Lafayette, Louisiana were taken for the construction of a highway. With its declaration of taking the plaintiff deposited in the Registry of the Court the sum of $126,116. Defendant's answer demanded compensation and damages totaling $285,670. After trial on the issue of quantum, the lower court awarded defendant judgment for the sum of $60,249.05 over and above the amount already deposited. From this judgment plaintiff has appealed asking that the total amount of compensation be reduced to $101,942 and that under the provisions of LSA-R.S. 48:456 judgment be awarded in favor of plaintiff and against defendant for the excess amount which plaintiff has deposited. Defendant answered the appeal asking an increase in the total compensation to $285,670, subject to a credit of $190,461.99 already received by defendant.
The record shows that two tracts of land were expropriated. The first parcel, designated as #10-9, contains 9.235 acres fronting 1,750.43 feet by a depth of approximately 230 feet on an existing state highway. This parcel of land was used by the defendant as part of a nursery. The improvements thereon consisted of a residence and a variety of greenhouses, sheds and other buildings used in connection with the nursery. On this tract there was also located a portion of defendant's nursery fields in which were planted large numbers of camellias, azaleas, magnolia, magnolia grande flora and other nursery stock.
The second parcel of land consisted of a triangular shaped tract containing 1.012 acres located just north of the first parcel, but not contiguous to it, and a short distance from the existing state highway. This tract had no improvements.
Defendant has accepted the valuations placed by the State on most of the improvements. The issues remaining on appeal are as follows: (1) Is the nursery stock movable or immovable and, if immovable, and therefore expropriated, what compensation is due defendant by reason of the expropriation of these plants. (2) The market value of the land in both tracts 10-9 and 11-3. (3) The value of the residence, barbecue shed and bird house designated as O, P & Q. (4) Is the State entitled to a refund of $24,174 of the item of $30,804 which it deposited for the expropriation of three greenhouses and a boiler room designated as buildings K, L, M and N because only a portion of these buildings was *599 actually on the right of way and the remainder was off the right of way. (5) Is defendant entitled to an additional award of $7,400 for weather damages to movable potted plants which were located in greenhouses expropriated and for which defendant did not have storage room in other greenhouses.
Our learned brother below decided the issue of the nursery stock in his well considered written opinion, the following portion of which we adopt as our own:
"At the trial of this rule, it was admitted by the attorneys representing the department of highways that the nursery stock was not included in fixing the value of the land and improvements. In addition, defendant Henderson established by his own testimony that the plants growing on the property consist of large shrubs and trees, and other plants, vines, and flowers generally used in large landscaping jobs, and that they could not be moved to another location until this fall because they would die if transplanted at this season of the year. He further testified that it would cost $25,000 to $30,000 to effect this transplanting operation in the fall, using a crew of men and winch and trailer trucks and other heavy equipment for this purpose.
"Henderson also called Mr. Earl Vallot, a nurseryman of considerable experience in Lafayette Parish, who testified that he had been requested by Mr. Dan A. Ritchey, Jr., to estimate the value of the nursery stock in the right of way; that he had done so, and had reported to Mr. Ritchey that his appraisal ran to $45,249.05. He was paid for these services by the Department of Highways. A list of the plants and their value as made and determined by Mr. Vallot, is in evidence marked D-1 for identification. A copy of his inventory was furnished to the State at the time he made it.
"No evidence was introduced by the State in rebuttal, counsel taking the position that these plants growing in the soil were not part of the land but were movable property, and hence could not be included in the estimate of the value of the land and its improvements for expropriation purposes, because under LSA-R.S. 19:1, expropriation extends only to `immovable property.' In support of this proposition, they cite and rely upon R.C.C. Art. 468, and the cases of Folse v. Triche, et al., 113 La. 915, 37 So. 875, and Rosata v. Cali, La.App., 4 So.2d 54. Also cited are excerpts from 42 Am.Jur. 200, 201, and 73 C.J.S. Property §§ 8-9, pp. 174-175.
"It is the opinion of this Court that the position taken by the State is untenable. The case of Folse v. Triche, supra, is clearly inapplicable here. In that case certain machinery placed upon a plantation for use in a sugar refinery and hence becoming immovable by destination, was declared to have been converted to movable property again as a result of a fire which destroyed the refinery. Even so, the Court on rehearing held that such part of the machinery as would be used in reconstructing the refinery would not be considered as having lost its character as immovable by destination, and only that portion of the machinery or equipment which could not be so used would be considered as having reverted to its status of movable.
"In Rosata v. Cali, supra, the community of acquets and gains had been dissolved by the death of the wife. Included in the community was a strawberry crop planted by the husband on the wife's separate property, and the court of appeal held that under R.C.C. Art. 2407, such was a movable and under an agreement between the legatees after the wife's death, passed to the husband who acquired all of the community *600 movables other than a packing shed and sewing machine. Again, we find no possible theory upon which this holding can be extended to the case at bar.
"On the contrary, it seems clear that such nursery stock as is located on Mr. Henderson's property is not immovable by destination, but actually forms part of the realty and is immovable by nature. R.C.C. Art. 465, dealing with such matters, reads as follows:
"`Standing crops and the fruits of trees not gathered, and trees before they are cut down, are likewise immovable, and are considered as part of the land to which they are attached.
"`As soon as the crop is cut, and the fruits gathered, or the trees cut down, although not yet carried off, they are movables.
"`If a part only of the crop be cut down, that part only is movable.'
"The Court has been unable to find a specific instance where the above article has been applied to nursery stock by the Courts of this State, but there are a host of decisions in our jurisprudence that crops of rice, cane, corn, cotton, grown by the owner of the soil, are immovable by nature, form part of the land, and pass with it if the same be sold before they are harvested, unless expressly reserved and excepted from the sale. This is a basic concept in our law, and is so well settled as to require no further citation. Planiol, Traite Elementaire De Droit Civil, has this to say regarding the interpretation placed upon the corresponding articles of the Code Napoleon:
"`2205. All plants which grow from the ground are immovable as long as they are attached to the soil. This rule applies to the most humble of plants as well as to the greatest oaks of the forest. The French Code takes this rule for granted but does not express it in general terms. The lawmaker applies it solely to crops and fruits, "to standing crops and the fruits of trees not gathered" to use the common formula (500). Foreign Codes, on the contrary, have an explicit provision covering this point (Italian Code, Art. 410, Spanish Code, Art. 334, S. 2; German Code, Art. 94).' (Emphasis added.)
"`2206. Condition of Their Immobilization

`"Plants are immovables provided their roots are in the soil itself. It follows that plants and shrubs placed in pots or boxes are movables, even though the pot or the box be covered with earth during the late spring, summer and early autumn. But it is not necessary, when the plant is put in the ground, that it remain there indefinitely. Thus, the trees of a nursery garden are immovables, even though they be destined eventually to be displaced.' (Emphasis added.)
"The uncontradicted evidence in this case is that the plants listed by Mr. Vallot, found within the limits of the right of way sought on Mr. Henderson's land, shows that the nursery stock have their roots imbedded in the soil, and are not in pots or boxes, some few of the smaller items being cuttings planted in the ground and not yet rooted.
"Nor was the power of eminent domain a stranger to the laws of France, although probably not in the distilled form set forth in [LSA-] R.S. 48:441 et seq., and the learned French scholar in the same work has this to say, which we deem to be most appropriate here:
"`No. 2214. Difference between Immovables by Nature and Immovables by Destination * * *'"
*601 `"(2) In the case of the exercise of the right of eminent domain, the expropriator is not held, in principle, to pay the value of things which are only immovable by destination because they continue to exist, as movables, and to retain their value and utility, and they do so even when separated from the immovable. There is an exception solely for the things which could not be transported conveniently or which would suffer too great a depreciation on account of their removal. The expropriation award on the contrary, necessarily comprises all that has become immovable by nature, following its incorporation in the soil or in the building.' (Emphasis added.)
"Also of interest are comments to be found in the annotation in Vol. 1 A. L.R.2d pp. 887, 888, and 889; 42 Am. Jur. Sec. 19, p. 200, and 73 C.J.S. Property §§ 8-9, pp. 174-175.
"In view of the foregoing, the conclusion that the plants and shrubs, collectively referred to as `nursery stock,' growing in the soil on the property of Mr. Henderson and included within the right of way sought to be taken by the State for highway purposes, are part and parcel of the soil, is inescapable. They pass to the department with the soil in full ownership from the moment that the order of expropriation is signed."
In urging us to depart from the ancient rule that trees are part of the land in which they are rooted, plaintiff has cited the following from 42 Am.Jur. 200, Sec. 19:
"The courts are in conflict as to the nature, as realty or personalty, of nursery stock growing in the soil for sale and transplantation. The conflict arises, in large part, from the relationship and intention of the parties in the particular case, and the particular purpose for which the question is to be determined. That nursery trees and perennials are within the strict letter of the ancient rule that whatever is growing in the soil is a part thereof and must be regarded as real property is beyond doubt, and this is still the rule in some situations, and for some purposes, in the absence of any reservation or competent evidence of the intention of the parties to the contrary. The courts soon began to recognize the injustice of a strict application of the ancient rule, and to regard them as personalty in certain particular circumstances and relationships. In a recent case, it has been held that in the absence of evidence that the parties as between themselves intended that it should be a part of the realty, nursery stock growing in the soil should be classified as personal property."
It may be that in certain situations, as for instance in the case of landlord and tenant or vendor and purchaser, etc., (See also 73 C.J.S. Property § 8, p. 174) justice and equity might require a departure from the ancient rule in particular circumstances and relationships, but we find no such equitable considerations in the instant case. Actually, the equitable factors here favor defendant. The evidence shows clearly that except during the dormant season, from fall until about May 1, such nursery stock cannot be moved without great risk of loss. The order of expropriation was signed on April 29, 1960. On May 10, 1960 defendant filed a motion seeking dismissal of the order of expropriation or in the alternative a delay until January 1, 1961 to move said nursery stock. The evidence shows that in June of 1960, before the court was able to hear defendant's motion, the plaintiff cleared the right of way and destroyed all of said plants with a bulldozer, causing defendant to lose thousands of dollars. We do not infer that the plaintiff did not have the legal right to destroy the nursery stock, but under the facts we can see no equitable considerations favoring plaintiff's present argument that the court should treat it as being movable and therefore beyond the State's right of expropriation.
*602 Plaintiff contends further that if we hold the nursery stock to be immovable by nature, a serious problem will arise as to the measure of compensation to be awarded. Plaintiff argues that the only way we can consider the value of the nursery stock is insofar as it adds to, or detracts from, the value of the land for its highest and best use which is commercial purposes. This argument has no merit. We, like the trial court, are of the opinion that compensation should be allowed for this nursery stock as in the case of growing crops. We are aware that this constitutes an exception to the traditional definition of crops, as being harvested annually, but in all other respects this nursery stock is the same as a crop. It has been planted, cultivated, sprayed, and cared for like any other crop. It was intended to be dug from the soil and sold. Therefore, for the purposes of these expropriation proceedings we are of the opinion it should be treated as a crop and damages allowed for the value thereof at the time of its destruction under the provisions of LSA-R.S. 48:218 which reads in part as follows:
"In expropriating lands for rights of way, if any improvement of the landowner or any crops upon the land are damaged or destroyed by the location of the right of way, the owner may recover compensation, in addition to the compensation for the property or the right of way, for the actual injury to or destruction of the improvement or crop."
We do not find this conclusion in conflict with State of Louisiana Through Department of Highways v. Glassell, 226 La. 988, 77 So.2d 881 (La.S.Ct.1955) in which the court held native pecan trees "* * * not grown on the land as a special crop * * *" could not be regarded as constituting a separate item of damages and "* * * should have been considered by the judge only in determining the value of the land on which they were located * * *." In the instant case the nursery stock was not composed of native trees and was grown as a special crop.
In awarding $42,749.05 as compensation for the destruction of the nursery stock, the trial judge rendered well considered written reasons which we adopt as our own:
"At the trial, it was stipulated that all testimony taken on trial of defendant's motion to recall the original judgment of expropriation should be considered on the decision of this cause. During that trial it was brought out that the department of highways had, through Mr. Ritchey, engaged Mr. Earl Vallot, a nurseryman of Youngsville, Louisiana, to inventory and appraise the nursery stock in the right of way, which he did prior to the filing of the suit and prior to the time that the highway department or its legal staff decided that this nursery stock constituted movable property. His inventory in detail is in evidence identified as D-1, and the appraisal thereof totals $45,249.05. Mr. Vallot gave three copies of his report to Mr. Ritchey, and was paid for his services by the Department of Highways.
"Having heretofore decided that this nursery stock formed part of the land, and should have been considered in the estimate made by the State, the Court must now determine what additional value should be awarded for the taking thereof, and whether or not the original estimate of value of the land and its improvements lying within the right of way should be increased or diminished. The evidence consists of 163 pages, in addition to many exhibits and the transcript of the original motion hereinabove mentioned, and will not be detailed in this opinion.
"In addition to Mr. Vallot, the State produced Mr. L. D. Kelleher, Jr., a nurseryman of Baton Rouge, and Mr. Edwin Lott, New Orleans, District *603 Entomologist for the Louisiana Department of Agriculture, who has held that position for some thirty-two years, a gentleman of great eminence in his field. Mr. Kelleher fixed the value of the nursery stock within the right of way at $21,990.55, based on an inspection made December 22, 1959. Some of the plants were not included in the inventory according to the written report made, these being some fifty pine trees (used for shade in the cultivation of orchids at the nursery), a large number of camellias affected by scale which were then unmarketable, and a large number of azaleas. Mr. Lott was consulted with regard to the disease problem, and his testimony is simply that on December 22, 1959, the date of his inspection, the scale infestation of the plants excluded was such that they could not have been sold under the regulations of the department of agriculture. His written report is also in evidence.
"It was brought out in the testimony, however, that scale of this type is a common problem to nurserymen; annual inspections are conducted by agents of the department of agriculture and a written report made to the operators. Scale is controlled by application of an oil-emulsion spray, applied generally in the Spring, after all danger of freezing is past, and another inspection is made after which the plants are usually found free of disease and are cleared for sale.
"Henderson's Nursery was never denied a permit to operate, although scale was found and reported two or three years prior to 1959. The cost of applying this spray, which is a routine procedure in the nursery business, amounts to a maximum of $50 per acre. Mr. Lott testified on cross examination that plants can be marketed in from two weeks to one month after spraying (Tr. 55), and that the infested leaves are replaced by the growth cycle in the Spring.
"The taking in this instance occurred on April 29, 1960, on which date the Court must conclude that in the ordinary operation of this nursery the stock would have been cleaned up and marketable.
"Mr. Lott mentioned some freeze damage noted by him in some of the young azaleas, and in his written report indicated this to have been in 185 Kings white and 1700 pink formosa, with some additional water damage found in some sasanqua and camellias. He testified that at the time of his inspection the nursery appeared in a neglected (overgrown) condition. In the written report he used the term abandoned, however, in his testimony which impressed the Court as being very fair, said that neglected was a more fitting description (Tr. 51). He also said that the plants he saw were not to be classified as plants that should have been destroyed or dug out (Tr. 56). In short, his opinion is that Mr. Henderson would have been required to `clean up' before marketing the diseased plants.
"Obviously, the difference in the appraisal of Mr. Vallot and Mr. Kelleher lies in the fact that Mr. Vallot saw the plants at a different time of the year and considered them all marketable, while Mr. Kelleher saw them during the winter while they were at their worst, so to speak, and did not assign any value to a large number of items which were not considered marketable at that time by Mr. Lott. The Court must attempt to fix the value of this property on the basis of the testimony in the record. Mr. Henderson increased the Vallot appraisal, but did not take into account the water and freeze damage noted by Mr. Lott, or the scale. The values used by Kelleher and Vallot are very much the same, the *604 difference being in the number of plants listed.
"Mr. Henderson stated that it was his practice to clean up early in the Spring, cultivate his plants by mechanical means and remove summer grass, killed by cold during the winter, and to apply spray around the middle of March. He is corroborated in this by the critical reports made by the State inspectors in the years prior to 1959 and 1960, with subsequent issue of his license to operate.
"Counsel for the State suggests in brief that Henderson's nursery was abandoned. The record does not reflect such to be the case; on the contrary, the business was principally large landscaping jobs, using large plants and shrubs, and operated by him profitably in this fast growing community.
"Considering Mr. Vallot's estimate, and deducting therefrom the cost of treating the plants in the Spring of 1960, based upon $50 per acre on 9.235 acres, we have a deduction of $461.75 to render the plants marketable in April, 1960. The camellias infested with the scale could have been cleaned up by spraying between March 15 and April 9 (Tr. 44), so that this deduction from Vallot's estimate would appear to be the only reduction in his value that should be applied. However, considering the fact that some of the azaleas were in briars, and some plants showed water and cold damage, (there being no testimony in the record as to how much this would have affected their value for sale), the Court feels that a total allowance should be made of $2500.00, reducing Mr. Vallot's estimate to $42,749.05 being the value of the property taken on April 29, 1960.
"Since these plants are in the nature of growing crops, this value is to be added to the value of the land."
The next issue is the amount of compensation to be awarded for the two tracts of land taken. The measure of compensation is admittedly the market value of the land for its highest and best use at the time of its expropriation on April 29, 1960. The tract designated as #10-9, containing 9.235 acres fronting 1,750.43 feet on the Billeaud-Lafayette State Highway and located one to two miles outside the city limits of Lafayette, was found by the trial judge to have a value of $50 per front foot. We agree with the trial judge's reasons as follows:
"We next consider the value given to the bare land and its improvements. Mr. Ritchey and Mr. Fleming fixed the price at $40 per front foot. Mr. Dwight Andrus, Mr. D. S. Young, and Mr. Chester Martin, all realtors in Lafayette Parish, valued this property at from $60 to $75 per front foot. Lafayette is a rapidly growing community, and as a result in recent years land values have increased at a phenomenal rate. Mr. Andrus and Mr. Young are perhaps the leading developers of the area and their opinion, along with that of Mr. Martin is entitled to great weight. Their study of the land in question, however, was not so thorough and detailed as was that of the State's appraisers insofar as tract 10-9 is concerned. Mr. Ritchey cites comparable sales of land situated on other highways going into Lafayette, where prices ranging from $45 per front foot to $54 per front foot were paid, and which he `adjusted' to the property under discussion arriving at his value of $40. The adjustment was apparently a conclusion reached by him resulting from his own opinion that the other properties were more desirable than the Henderson property, after considering various factors elaborated upon in his testimony.
"It is the duty of the Court to determine from this evidence what the fair market value of the property expropriated *605 was on April 29, 1960. Dept. of Highways, State Through, v. Havard, 239 La. 133, 118 So.2d 131; Dept. of Highways, State Through, v. Ragusa, 234 La. 51, 99 So.2d 20; Dept. of Highways, State Through, v. Tolmas, 238 La. 1, 113 So.2d 288. Offers for purchase are not admissible for showing value. Dept. of Highways v. McDuffie, 240 La. 378, 123 So.2d 93.
"It was brought out in the testimony of Mr. Martin (Tr. 75), that because of the location of the Lafayette Municipal Airport which limits the use of certain of the property along this highway, there is little available land for sale except that of Mr. Henderson. Considering all of the factors involved and the comparable sales mentioned by Mr. Ritchey, the Court is of the opinion that the value of $40 per front foot placed on tract 10-9 is too low, and same should be increased to the sum of $50 per front foot, which would make the total value of the land $87,500.00, a difference of $17,500.00 in the amount paid."
As to the triangular tract of land designated #11-3 and containing 1.012 acres, the trial court awarded $3,000. This was the market value found by the State's expert witness, Mr. Ritchey. Counsel for the defendant argues strenuously that this award should be increased to $5,000 per acre which was the amount of the appraisal of the expert witnesses, D. S. Young, Dwight W. Andrus and Chester Martin. However, counsel for the plaintiff has pointed out that this tract of land does not front on the highway, being located approximately 50 feet from the existing Billeaud-Lafayette State Highway. Under the circumstances we find no manifest error sufficient to disturb the award of the trial court.
The trial court awarded defendant $12,080 for the residence and barbecue house. Defendant contends that this award should be increased to at least $19,000 based on the testimony of Mr. Young and Mr. Martin that the residence contains approximately 2500 square feet of space and would cost $27,000 to replace. It was admittedly depreciated and in need of maintenance. The trial judge was apparently influenced by the evidence that this dwelling was of an unusual hollow tile construction which, although costly, was not particularly desirable for residential construction. Furthermore, the evidence shows clearly that this area is now commercial in nature and the dwelling was actually being rented for $150 a month. Considering all of these factors we find no manifest error in the trial court's award.
As to the award for the buildings designated K, L, M and N, the record shows that M is a building measuring 60 feet by 44.5 feet used as a boiler room, and K, L and N are greenhouses, each measuring approximately 30 feet by 104 feet, attached thereto and all used as one unit. The right of way took 8 to 10 feet off the end of the boiler room and the side of the greenhouse designated as K, but the remainder of these buildings was outside of the right of way. In making his appraisal, prior to the expropriation, the State's expert realtor, Mr. Ritchey, admittedly considered these four buildings as being one unit and consequently they were listed in the order of expropriation as being taken and their total appraised value was deposited in the Registry of the Court. However, the State now argues that it was in error in listing these four buildings in its order of expropriation because of the rule of law that an expropriating authority cannot expropriate more than it needs. Plaintiff cites LSA-R.S. 48:456 which provides in pertinent part "If the compensation finally awarded is less than the amount so deposited, the court shall enter judgment in favor of the plaintiff and against the proper parties for the amount of the excess." The State contends that its estimate should have included K, as it did, at its value of $6,630, but that the balance of $30,804 deposited by the State *606 for these improvements constituted a deposit for buildings that it could not expropriate, since they were outside the right of way, and that therefore the State's deposit for these items was excessive by the sum of $24,174 for which amount it claims a refund.
In support of this contention plaintiff cites Stewart v. Department of Highways, 113 So.2d 120 (Orleans App.1959) in which part of a building was situated on the land taken for a right of way and the remainder of the building was situated on land left to the owner. Mrs. Stewart contended the State had no right to demolish that portion of the building off the right of way and asked for damages for trespass. It is true, as counsel for plaintiff in the instant case contends, the court stated the general rule that an expropriating authority can take only as much property as it needs, but in the Stewart case the facts show that the landowner objected to the Department of Highways taking any portion of the building located outside the highway. The court held as follows:
"The contention of the Department of Highways and of the other defendants is that the judgment under which the value of the expropriated property was fixed contemplated that in the amount awarded there was included the value of the entire structure in question, since it would be manifestly unfair to a landowner for an expropriating authority which requires land on which a part of a building is located to take the position that it need pay only the proportionate value of that building determined in accordance with how much of the building is on land taken and how much is on land not taken from the landowner.
"(1) There is no doubt of the soundness of this argument in most instances. Surely where a situation exists in which the demolition of a part of a building would result in the destruction of or the serious depreciation in the value of an unneeded portion, the expropriating authority could not be heard to say that it should pay only for that part of the building which is on the land which is needed by it. On the other hand, however, there is no principle better established than that an expropriating authority cannot take one inch or one item of property more than is actually needed if the owner of a building which is partially on land which is expropriated desires that the other unneeded portion be cut off and left to him."
In the instant case the defendant did not object to plaintiff's taking the entire buildings and the evidence shows clearly that the three greenhouses and the boiler room to which they were attached were all one unit and that the demolition of the boiler room and a portion of one of the greenhouses seriously depreciated the value of the unneeded portion of this unit. We therefore are of the opinion that the plaintiff could and did expropriate and pay compensation for this entire improvement and cannot now claim reimbursement for the portions thereof just outside the right of way.
Our Supreme Court granted a writ of certiorari in the Stewart case and reversed the judgment of the Court of Appeal for the reason that since the entire building, including that portion located outside the right of way, was described in the order of expropriation, and a sum deposited in the compensation therefor, the entire building was therefore in fact expropriated. No appeal having been taken from the judgment of expropriation the Supreme Court held it was res judicata and the State had a right to demolish the entire building. See Stewart v. Department of Highways, 240 La. 812, 125 So.2d 372 (La.S.Ct.1960).
The final issue is defendant's claim of $7,400 for weather damage to movable potted plants which were located in the greenhouses expropriated and for which defendant contends he had insufficient storage *607 space to prevent these damages. Defendant cites no authorities in support of his contention. Clearly this claim has no merit. These plants were movable and could not be expropriated. Our jurisprudence is well settled that an expropriating authority is not liable for the costs or damages incurred by the owner in moving from the expropriated premises. Such injuries, inasmuch as they result only from the exercise by the State of its legal right, are damna absque injuria. See Rapides Parish School Board v. Nassif, 232 La. 218, 94 So.2d 40; State v. Sauls, 234 La. 241, 99 So.2d 97.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.