167 So.2d 503 (1964)
STATE of Louisiana, through the DEPARTMENT OF HIGHWAYS,
v.
Johnnie E. SUMRALL et al.
No. 6129.
Court of Appeal of Louisiana, First Circuit.
July 1, 1964.
Rehearing Denied September 30, 1964.
Writ Refused December 1, 1964.
W. Crosby Pegues, Jr., D. Ross Banister, Glenn S. Darsey and Braxton B. Croom, by Glenn S. Darsey, Baton Rouge, for appellant.
Benton & Moseley, by E. D. Moseley, H. Alva Brumfield and Sylvia Roberts, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
ELLIS, Judge.
The State of Louisiana, through the Department of Highways, expropriated certain property belonging to the defendant, Johnnie E. Sumrall in the Parish of East Baton Rouge, Louisiana. The property consisted of part of lots 113, 114 and 115 of Glenoaks Subdivision and part of an adjoining three acre tract. Situated on Lots 113 and 114 was a filling station which was leased to Oren Russell and Oren W. Russell, *504 also joined as parties defendant. Lot 115 and the 3 acre tract to the immediate north thereof were unimproved land.
The Highway Department estimated just compensation[1] as determined by the estimated market value of the property taken plus severance damages to the remainder of the property at the sum of $83,925.00. This amount was deposited into the registry of the court and withdrawn by the defendant, Sumrall.
The plaintiff has correctly stated the issues to be determined by this court as follows, to-wit: (1) the market value of the property expropriated. (2) The value of the severance damages, if any, sustained by the remainder of the property as a result of the expropriation. (3) The market value of the leasehold interest, if any, and (4) whether the amounts due the fee owner and the owner of the leasehold interest should be determined separately and added together to reach a legal conclusion of just compensation, or whether the market value of the fee should be determined as if owned by a single person unencumbered and the resulting value apportioned between the owners of the interest involved. Obviously, should it be concluded that the lessee has no interest in the proceeds, the last issue need not be considered.
The trial of this case produced a record of over six hundred pages of what the trial judge has correctly described in his written reasons for judgment as a "tangled web of testimony." During the course of the trial, Mr. Kermit Williams and Mr. W. B. McCants testified as expert witnesses for the defendant property owner, and Mr. J. Clifford Doiron and Mr. Leroy Cobb testified as experts for the Highway Department. The trial judge found the market value of the property actually taken by the Highway Department to be the sum of $77,940.00 and added to this amount the sum of $48,420.00 representing severance damages. This finding of $126,360.00 was reduced to the sum of $125,000.00 as this was the maximum amount prayed for by the property owner. The trial judge also rendered judgment in favor of the lessees in the additional sum of $21,148.50 representing the excess market value of the lease over and above the contract value of the lease, which, added to the award of $125,000.00 to the owner, made a total award of $146,148.50.
Defendant landowner withdrew in its entirety the initial deposit of $83,925.00. Following trial the state deposited the additional sum of $78,374.93, which consisted of the additional values allowed with interest, on the overplus of the initial deposit from the time of filing suit until the time of the second deposit. Therefore, with plaintiff's initial deposit of $83,925.00 and subsequent deposit of $78,374.93, the state deposited sums aggregating $162,299.93.
Of these total deposits lessee withdrew $26,636.97, which consisted of their award of $21,148.50, plus interest at 5% from February 3, 1958 (the date of the filing of the suit) until April 10, 1963 (the date of the state's second deposit).
Out of the second deposit of $78,374.93, the landowner withdrew $51,737.96, making a total recovery of $135,662.96, the difference between said sum of $125,000.00 allotted by the trial court being represented by interest due by the state on the sum awarded landowner by the trial court in excess of plaintiff's initial deposit.
Lots 113 and 114 fronted 151.82 feet on Plank Road by a depth of 217.43 feet. Lot 115 measured 151.82 feet on Plank Road by a depth of 305.31 feet on its south line and a depth of 253.19 feet on its north line. The three acre tract measured 313.87 feet along Plank Road by a depth on the south side of 515 feet and a depth on the north side of 408 feet.
*505 The Highway Department has expropriated the front portion of Lots 113 and 114, measuring 105.91 feet on the South by 63.09 feet on the north. The front 63.09 feet of Lot 115 and the three acre tract were likewise expropriated. The amounts taken, reduced to percentages, indicate that 42% of Lots 113 and 114 were taken, 26% of Lot 115 was taken and 14% of the three acre tract was taken.
Mr. Cobb estimated a front foot value of $175.00 for lots 113 and 114; a front foot value of $185.00 for Lot 115, and a front foot value of $200.00 for the three acre tract. Mr. Williams estimated the front foot value of Lots 113 and 114 to be $220.00; the front foot value of Lot 115 to be $250.00, and the front foot value of the three acre tract to be $300.00. Mr. McCants, while using as lightly different front foot valuation than Mr. Williams, arrived at a total market value of the whole of the plaintiff's property at only $380.00 less than the value established by Mr. Williams.
Using what they termed depth tables, Mr. Williams and Mr. McCants estimated the value of the land actually taken at $56,840.00 and $56,852.00, respectively.
Believing Lot 115 had a greater front foot value than Lot 113 and Lot 114, and that the 3 acre parcel of land on the corner is worth more per front foot than Lot 115, and after considering all of the testimony in this record, we had thought that an average front foot value of $260.00 to be fair, but upon realizing that this sum was only a few dollars less than the average front foot value placed upon the property by defendant's experts, we accept their evaluations of the property involved herein, namely, $220.00 per front foot on Lots 113 and 114, $250.00 per front foot value on Lot 115, and $300.00 per front foot value on the 3 acre tract, to be used as a basis for arriving at the value of the portion expropriated from each tract. Using these figures, Lots 113 and 114 would have a value of $33,400.00, Lot 115 approximately $38,000.00, and the three acre tract $94,200.00, for a total of $165,600.00, plus $21,100.00 improvements, for a total value of the whole of $186,740.00. We are also of the opinion that $21,100.00 represents fair value for the improvements on Lots 113 and 114. This amount represents the approximate average value placed upon the improvements when we consider the value of each of the four experts.
In accepting the above front foot value of Williams, we have not considered property used as comparables by any of the experts which was sold subsequent to the date of the expropriation. We base our value not only upon the testimony of the experts but also upon the case of the State of Louisiana, through the Department of Highways, v. McDuffie, 240 La. 378, 123 So.2d 93, in which the property owner of lots in Glenoaks Subdivision was successful in establishing a front foot value of $240.00 per foot for his tract of land which measured 195 feet on Plank Road by a depth on the south side of 180 feet and a depth on the north side along Glenoaks avenue of 163 feet. Also, the only sale of real estate made on May 8, 1957, prior to the date of the taking on the 3rd of February 1958, and which was found to be comparable by all four experts who testified, was a sale from Langlois to the Tremarco Corporation, which involved Lots 1, 2 and 3 of Langlois place, fronting 142 feet on the east side of Plank Road by an average depth of 163 feet. This sale was for $31,000.00 or an approximate average of $220.00 per front foot.
This court also arrived at the value of property expropriated on the north side of the Airline Highway just east of the intersection of the Airline Highway and Plank Road, consisting of a lot having a frontage of 151 feet on the Airline Highway by a depth on its east line of 139.6 feet; a depth on its west line of 159.2 feet and a width across the rear of 150 feet, with improvements consisting of a service station, combined with a restaurant, etc., in the case of State Through Dept. of Highways v. Lewis, La.App., 142 So.2d 652. In *506 this case we fixed a value of the "raw land prior to the taking, in our opinion is $33,975 or $225 per front foot; 35% of said amount, or $11,891.25, is a fair computation of the value of the raw land taken; * * *". Therefore, based upon the testimony of the experts, the comparable, and the value given to similar lots in the cases cited, and the great advantages enjoyed by the subject property, greater size and the fact that Lot 115 was on a corner, as well as the three acre tract, we believe that $266.00 is a fair average value per front foot for the property involved in this suit.
It is now necessary that we consider the value of the raw land taken, that is, the actual land expropriated from the lots heretofore described and valued. It will be noted in the Lewis case that Mr. Williams and Mr. McCants testified on behalf of the defendants, and Mr. Cobb and Mr. Roseman testified on behalf of the plaintiff. Therefore, we have three of the appraisers in that case testifying in the case at bar. Also in the Lewis case it is to be noted that Mr. Williams and Mr. McCants used the same system, which they term "Depth tables", in arriving at a value of raw land taken as they have done in the present case. For example, in the Lewis case, the court in discussing the testimony stated:
"Mr. Williams and Mr. McCants evaluated the land which was taken, being 25% of the whole, to be worth 40% of the entire tract. In view of the fact that Defendants still retain the same length of front footage, we are of the opinion that this percentage for the taking is overly generous. Certainly their evaluation must be adjusted to the particular property, especially in view of the fact that they had deducted severance damage which, in part, included the fact that the original frontage had been removed from the property. Mr. Roseman in evaluating the property on the square foot basis rather than on front footage would attribute to each square foot of the lot equal value. It does not appear to be realistic that if the Department were expropriating the rear 25% of the property in question their evaluation of such portion would be the same as the front portion. Though it does not appear that an estimate of 40% as the value of the front 25% of the lot is warranted, a reduction to 25% of the whole, as contended by the Department's appraisers, likewise would not, in our opinion, present an accurate value of the front portion of the property. * * *"
In the present case these appraisers have attempted to follow the same procedure.
In the present case, counsel for the defendant in his brief has correctly analyzed the testimony and method used by Mr. Williams and Mr. McCants, in arriving at a value of the portion of land being taken by the Highway Department and we quote:
"After making an evaluation of the whole as above shown, Mr. Williams then estimated the value of the portion of the land being taken by the Highway Department. According to his analysis 42% of the land of Tract A was being taken; 26% of Tract B and 14% of Tract C. These portions were taken from the front of the property and, of course, reduced the size of the remainder. Mr. Williams, by utilization of depth tables assigned a higher value to the front portion of the properties than to the rear, and estimated the value of the land taken of Tract A in the amount of $20,060.00. The whole of the improvements amounting to $21,100.00 were taken from Tract A making a total of the portion taken on Tract A of $41,160.
"As to Tract B, the value of the part taken was estimated to be $15,580.00. It was his opinion that although 26% of the area was being taken as to Tract B that since this was being taken from the front portion, which had a greater value, approximately 40% of the value of Tract B was being taken, or $15,580.00.

*507 "As to Tract C, where 14% was being taken in area, he estimated a value being taken of 22% or $21,200.00.
"The foregoing method is in accordance with State of Louisiana through the Department of Highways vss. Finnon Lewis, et ux, 142 So.2d 652, wherein this Court concluded that 35% of the value of the land there involved was taken in a situation where approximately 25% of the frontage of the lot was expropriated.
"According to this estimate the total value of what was taken, including the building on Tract A, amounted to $77,940.00."
Naturally, we are fully cognizant of the criticism made by counsel for the plaintiff in brief as to the so-called "depth" method used by Mr. Williams and Mr. McCants in which he stated:
"Mr. Williams, as well as Mr. McCants, made use of depth tables in a manner which indicated a complete lack of understanding of the use of such tables. A depth table does not arbitrarily establish market value by means of the commonly known 4-3-2-1 rule, without regard to a standard depth established for a particular locality. To inform the Court fully, the following is abstracted from `The Appraisal of Real Estate, Third Edition, pages 118 and 119, published by the American Institute of Real Estate appraisers:
"`Depth Tables. The unit foot is a device employed to express equivalent values for a uniform depth of one foot of frontage of sites of varying depth. It represents an area of land having one foot of frontage, a uniform width, and a certain standard depth. If the adopted standard depth is 100 feet, then a lot 50 feet by 100 feet and worth $2,175 would have a unit-foot. value of $43.50. Another lot 50 feet wide, with a depth of 150 feet, might be worth $2,500 or $50 per front foot with the same unit-foot value of $43.50 that is, be equivalent in value of $43.50 per front foot for a depth of 100 feet times a depth factor of 115%.
"`Depth tables are tables of percentage designed to provide a uniform system of measuring the additional value which accrues because of added depth. A standard depth is established for a lot of a stated type. This standard was originally fixed in most localities as 100 feet. The series of percentages in the depth table begins with a lot of 100 foot depth which is designated as 100%. It ranges downward for less depthn and up ward for more depth, usually in accordance with past experience of utility or a computed curve.
"`Depth tables are primarily employed by assessing officials seeking to achieve uniformity in assessing practices. It must be emphasized vigorously that these depth tables are not universal or infallible. Such tables should be used only if, in the appraiser's opinion, they correctly reflect the value of the site being appraised, and if they might coincide with the thinking of a typical investor. A depth table developed to apply to conditions in one city may not even remotely apply to the conditions existing in another city. Real estate is a local product. Its value is founded on local conditions and local usage.

"`One of the first rules for depth was the so-called 4-3-2-1 rule. This is meant to indicate that the front quarter of a lot has 40% of the value; the second quarter has 30%; the third quarter has 20%, and the fourth or rear quarter has 10%. This leaves too wide a margin for assessment purposes. The deficiency has been overcome in the establishment of depth tables by percentages for every foot or for every 10 feet of depth.
"`Depth tables should vary for different types of property. Greater depth is often more important in a site for an *508 apartment building than in the site for a single-family dwelling. Certain kinds of commercial uses require still more depth. It may, for example, be necessary to provide customer parking space. In some modern types of shopping centers, the stores will be situated near the rear of the site, with customer parking in front. In such case, it could hardly be claimed that the land closer to the street and used for parking is worth more than the land underlying the stores, which are responsible for the parking area's usefulness.' (emphasis added)."
Regardless of the above, this court in the Lewis case accepted the principle of the so-called depth table of 25% of the whole, is worth 40% of the entire tract, to the extent of finding that 35% of the total value of the lot of $33,975.00 for the 25% of the front expropriated or $11,891.25 "is a fair computation of the value of the raw land taken."
Each case stands on its own facts but we believe that the valuations placed upon the property taken by defendant's experts in the sum of $56,850.00 is supported by the record. To this amount must be added the value of the improvements of $21,100.00 for a total value of expropriated property of $77,950.00.
Having arrived at the market value of the land and improvements actually taken it is necessary to consider the severance damages, if any, to which the land owner may be due.
Once this figure was established sales considered as comparable were used to determine the actual value of the remainder. We cannot accept the above estimates of severance damages as the only basis for severance damages in the instant case is the diminution in size of the property. The fact that the property is now located on a service road and not a main traffic artery is not compensable under the laws of this State. Patin v. City of New Orleans, 223 La. 703, 66 So.2d 616.
The land expropriated in Lots 113 and 114, has severely reduced the size of these lots. The best use of this property was commercial and it had been so used, as a gasoline station site. Due to its reduced size (42% was taken) it is no longer desirable for such a purpose. However, we have accepted a value of approximately 60% of the whole ($33,440.00) as the value of the front 42% expropriated.
Williams estimated the severance damage to all tracts after taking as $48,420.00, whereas McCants estimated the severance damage in the sum of $54,120.00. They both used the same method in arriving at severance damages. They estimated the value of the remainder as a part of the whole, being the value of the whole minus the value of the part taken. They then considered comparables on service roads. In this manner, Williams arrived at a value of the remainder of $108,800.00 and McCants at the sum of $107,762.00. By subtracting the value of the remainder after the taking from the value of the remainder, as a part of the whole, Williams arrived at a figure of severance damages totalling $48,420.00 and McCants at $54,120.00.
Doiron considered Lots 113, 114 and 115 together and was of the opinion that the value of the land and improvements amounted to $34,470.00 and damage to the remainder in the sum of $5,988.00.
Cobb was of the opinion that there was no severance damage to Lot 115, but there was $8220.00 severance damage to Lots 113 and 114. Neither Doiron nor Cobb was of the opinion that there was any severance damage to the remainder of the three acre tract. We are of the opinion that Cobb's evaluation of severance damage is correct.
This court is not impressed with the argument that Lot 115 and the three acre tract have suffered any severance damage at all. These parcels of land were *509 unimproved at the time of the taking and they were still sufficient in size after the taking for commercial development, and the three acre tract at the time of trial had been so developed. Accordingly, the severance damages awarded will be confined to Lots 113 and 114, and are fixed in the amount of $8220.00.
The trial court gave judgment for $21,148.50 in favor of the lessees. This figure was arrived at by computing the difference between the contract rent, that is, the amount of rent lessees were obligated to pay under the written lease and the economic value of the lease, that is, the amount of rent that the property should have brought in the current market. This amount of $21,148.50 would then represent an asset to the lessee on an economic advantage.
The lessees in the instant case, however, are not entitled to recover any amount for the reason that their written and recorded lease contains the following language:
"In the event said premises are either taken for public purposes or the zoning is changed so as to prohibit the premises being used for a service station, then and in those events, this lease is automatically cancelled; provided, the above events are actually accomplished."
In accordance with the opinions hereinabove expressed, judgment is rendered in favor of the defendant landowner against plaintiff in the sum of $86,170.00, together with interest at 5% per annum on the sum of $2,245.00 from February 3, 1958 to April 10, 1963.
It is further ordered that judgment is rendered in favor of the Louisiana Department of Highways and against the defendant landowner in the sum of $135,662.96, subject to credit in the sum of $86,170.00 and subject to a further credit of a sum equal to interest at 5% per annum on $2,245.00 from February 3, 1958 to April 10, 1963.
Judgment is also rendered in favor of the Louisiana Department of Highways and against Oren W. Russell and Oren Russel, insolido, in the full sum of $26,636.97, representing the amount awarded them by the trial court for non-compensable damages, with interest at the legal rate of 5% from the due date (date of payment by plaintiff) (April 10, 1963,) until paid.
Amended in part and reversed in part.
NOTES
[1] The Certificate of Estimate of Just Compensation signed by Bradley C. Mittendorf and Lowell M. Roseman, licensed realtors, fixed the value of land and improvements at $69,325.00 and damages at $14,600.00.