430 So.2d 1191 (1983)
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT
v.
EXXON CORPORATION.
No. 82 CA 0578.
Court of Appeal of Louisiana, First Circuit.
April 5, 1983.
Rehearing Denied May 20, 1983.
Harvey Lee Hall, Baton Rouge, for plaintiff-appellant State of La., Dept. of Transp. and Development.
*1192 Jerry F. Davis, Baton Rouge, for intervenor-appellant Jo Carolyn Langlois.
John M. Roper, New Orleans, for defendant-appellee Exxon Corp.
Before LOTTINGER, COLE and CARTER, JJ.
CARTER, Judge.
This is an expropriation proceeding in which both the intervenor, Jo Carolyn Langlois, and the plaintiff, State of Louisiana, Department of Transportation and Development (State), appeal the judgment of the trial court awarding Mrs. Langlois the sum of $8,482.73 as damages for business losses and attorney fees.
Prior to this expropriation, Exxon owned a gasoline service station situated at the intersection of Greenwell Springs Road and Joor Road in the city of Baton Rouge. The premises constituted a complete service station facility with a total of four access ways (two on Joor Road and two on Greenwell Springs road). In May, 1976, Mr. and Mrs. Langlois began operating the station under a lease and dealer sales agreement between Mr. Langlois and Exxon, and continued those operations until Mr. Langlois's death on June 7, 1977. On August 3, 1977, Mrs. Langlois executed a one year lease and dealer sales agreement with Exxon with the lease expiring on August 3, 1978. In 1978, Mrs. Langlois and Exxon executed a new lease and dealer sales agreement for the period August 3, 1978 through August 3, 1979, under the same terms and conditions as the previous contracts. Sometime during the middle of 1979, Exxon offered Mrs. Langlois a three year lease to begin on August 3, 1979, but Mrs. Langlois declined to enter into the lease since she had learned that the State of Louisiana had plans to reconstruct the intersection of Greenwell Springs Road and Joor Road. According to the proposed construction plans, two of the four access driveways to the service station would be permanently closed, and a high speed turning lane was planned for construction in front of the two remaining driveways. Although Exxon and Mrs. Langlois did not enter into the three year lease, Mrs. Langlois agreed to continue operation of the service station on the basis of a series of short term extensions of the existing contract varying between thirty and ninety days.
Construction work commenced in October or November of 1979 and was completed in May or June of 1980. Although Mrs. Langlois continued to operate the station for approximately eleven months after construction was completed, she finally closed the station April 30, 1981, at the termination of her last three month extension. Exxon then took over direct company management of the station, reduced gasoline prices considerably, but finally permanently closed the station in November of 1981.
On March 6, 1979, the State instituted this proceeding by filing a petition for expropriation pursuant to La.R.S. 48:441-460. Contemporaneous with the filing, the State deposited the sum of $49,871.00 into the Registry of the Nineteenth Judicial District Court, this amount representing the State's estimate of the compensation due for the property taken and severance damages occasioned thereby. On March 7, 1979, an order of expropriation was signed transferring the ownership of the expropriated property to the State. On August 27, 1980, Mrs. Langlois, with leave of court, filed a petition of intervention seeking compensation for her business losses suffered as a result of this expropriation.
The State and Exxon subsequently entered into a joint stipulation and a consent judgment was rendered whereby Exxon accepted the $49,871.00 deposited in the Registry of the court as just and full compensation for the property of Exxon actually taken and any severance damages which occurred to the remainder of Exxon's property as a result of the expropriation. The trial proceeded on Mrs. Langlois's petition of intervention, and judgment was subsequently rendered in favor of Mrs. Langlois for damages suffered from November 1979 through July of 1980 in the sum of $8,482.73, plus interest and 25% attorney fees.

*1193 SPECIFICATIONS OF ERROR
Appellant, Mrs. Langlois, contends that the trial court erred as follows:
(1) In disallowing profits lost subsequent to July 1980 as speculative, and
(2) In awarding insufficient damages.
Appellant, the State, contends that the trial court erred as follows:
(1) In awarding lost profits from November 1979, (approximate date construction began) through July 1980, (approximate date construction ended), and,
(2) In making an excessive award based on erroneous computations.

ISSUE
The issue before the court is the amount of compensation, if any, due Mrs. Langlois for business losses, if any, suffered as a result of the expropriation.
The basic issue raised by the State is whether Mrs. Langlois had sufficient interest to justify any award.
The State questions, first of all, whether a person with a leasehold interest is entitled to an award in an expropriation proceeding. Mrs. Langlois argues that the expropriation statutes do not limit the class of persons to whom compensation is due to include only owners of property.
Courts have long recognized a lessee's status under law to require compensation for expropriation of lease property. State, Department of Highways v. LeBlanc, 319 So.2d 817 (La.App. 1st Cir.1975); State Through Dept. of Highways v. Hayward, 338 So.2d 1171 (La.App. 2d Cir.1976).
Under the 1974 Louisiana Constitution, Art. 1, Sec. 4[1], an owner must be compensated to the full extent of his loss. The clear intent of the framers of the 1974 Constitution was to expand rights to compensation to include the rights not only of the property owners but also of other persons who have legal status to require compensation, such as lessees. We note and approve the following language relating to La. Const., Art. 1, Sec. 4 by Professor Hargrave in 35 La.L.Rev. 10, at p. 18:
"Reference to `payment to the owner or into court for his benefit' was not meant to restrict the class of persons who could claim compensation to `owners' in a technical property law sense. The purpose was to give citizens more rights,85 and the term, as stated by the author of the final compromise, `is intended to be used in its broadest sense, in other words, a leasehold interest in land is a property right as you and I well know, and there's been some trouble over that in the past.86 In fact, when one couples this intent with the requirement that compensation be to the full extent of one's loss, the purpose emerges of giving protection to a broader category of persons than was previously the case. It is also clear that by referring to property `taken or damaged' compensation must be given not only when ownership or a real right is taken, but also when property is damaged...." (Footnotes omitted)
The State's contention that a lessee has no status to entitle him to an award for *1194 loss of a business interest in an expropriation proceeding is without merit.
The State argues that in paragraph 12 of the last formal lease, Mrs. Langlois waived any rights to any part of an award Exxon may receive. That paragraph reads as follows:
"Any and all payments made for or arising from any such taking or for damages to the premises resulting therefrom, shall belong and be payable entirely to Exxon, and Lessee hereby waives any right to any part of the award, and hereby assigns same to Exxon."
This paragraph, however, clearly refers to payments for taking and for damages to the premises (severance damages) and does not include the type of loss sued for by Mrs. Langlois, that is loss of business and business profits.
The State further contends that loss of business profits is not a loss that must be compensated in an expropriation proceeding. It is true that prior to the effective date of the 1974 Louisiana Constitution, consequential injuries, such as loss of business profits, were not compensable in expropriation proceedings. The Louisiana Constitution of 1921 simply required payment of "just compensation" for an expropriation. Article 1, Section 4 of the 1974 Constitution, however, has expanded the concept of compensation and specifically provides that "the owner shall be compensated to the full extent of his loss." The court in State, Through Dept. of Highways v. Champagne, 356 So.2d 1136 (La.App. 3d Cir.1978), discussed the meaning of the new constitutional provision:
"... We consider the intent of the redactors of the 1974 Constitution to be that once the landowner has received compensation in any amount sufficient to place him in as good a position pecuniarily as he would have been, had his property not been taken, the landowner has received compensation `to the full extent of his loss'..." (p. 1140)
The Third Circuit Court of Appeal has held that under Art. 1, Sec. 4 of the 1974 Constitution, loss of future rentals under a lease which was terminated by an expropriation proceeding was compensable. State, Dept. of Transp. & Development v. Davis, 400 So.2d 926 (La.App. 3d Cir.1981), writ denied, 406 So.2d 611 (La.1981), writ denied, 409 So.2d 611 (La.1981).
The question of whether loss of business is compensable was discussed in the case of State Through Dept. of Highways v. Constant, 369 So.2d 699 (La.1979). In that case, the state highway department expropriated the entire loading and parking area of a marina operation. This Court had reduced a trial court award to the owner of a marina because the replacement cost of the parking and loading area was in excess of the value of the marina (property at a whole). The issue therefore, was whether under La. Const. of 1974, Art. 1, Sec. 4 ("the owner shall be compensated to the full extent of his loss,") an award could be allowed to the owners sufficient to restore their business facilities to conditions prior to the taking, even though the amount so required was in excess of the market value of the parent tract from which a portion was taken for highway purposes. The Supreme Court answered in the affirmative and stated at page 702:
"In view of the constitutional requirement that they be compensated to the full extent of their loss, it is not constitutionally significant that the award to them will exceed market value of the property used in their business operations. The very purpose of the constitutional language was to compensate an owner for any loss he sustained by reasons of the taking, not restricted (as under the former constitution, see Dakin and Klien, Eminent Domain in Louisiana (1970) 70-72, 78-79, 96-96, 154-262), to the market value of the property taken and the loss of market value of the remainder, sometimes including the cost to cure such damagei.e., where (formerly) the award was based solely upon the physical value of the property and the economic injury to the property itself, but not including injuries to a business or the cost of moving it due to the taking."
*1195 The Supreme Court reversed this Court and stated that the trial court correctly determined that the landowners should be compensated for the cost of replacing the loading area.[2] The Supreme Court further held that the owner must be fully compensated for the loss occasioned their business operation by the taking, noting that this award was in addition to the award for the value of the land actually taken and for the improvements thereon which were destroyed by the taking.
It is clear from an examination of Constant, supra, and La. Const. Art. 1, Sec. 4 that an owner is entitled to compensation to the full extent of his loss, including business losses.[3] The right to use property for business pursuits in hope of generating a profit is clearly one of the rights which flows from property ownership. When this right is separated from the actual ownership of the property as in the instant case by lease, the lessee becomes an owner of a private property right and is entitled to protection from having the property taken without compensation just as the owner of property in full ownership has this right.
The trial court awarded Mrs. Langlois damages for business losses for the period of November, 1979 through July of 1980. It is apparent from the written reasons for judgment that the trial court believed a formal written lease between Mrs. Langlois and Exxon was in effect from August 3, 1979 until August 3, 1980. The trial court thus based its award on the time period from the approximate date construction began until the date he believed the written lease terminated (August, 1980). However, the written lease actually terminated on August 3, 1979, at which time Exxon and Mrs. Langlois executed a series of verbal extensions until April 30, 1981. The trial court said that it would not award damages for loss of future profits because there was no lease in effect (other than the short term extensions).
The State contends that the trial court erred in awarding lost profits from November 1979 through July of 1980 because Mrs. Langlois's written lease expired in August of 1979 and was not renewed.
Mrs. Langlois contends that not only was the award given appropriate, but that she is entitled to an increase to reflect damages suffered from business losses for the period August, 1980 through April, 1981; and even thereafter for the economic life of the station or Mrs. Langlois's work-life expectancy.
The record shows that the series of verbal extensions began in August of 1979 and continued through April, 1981. The verbal extensions, as opposed to a three year lease, were a direct result of and in anticipation of the expropriation which resulted in diminished access to the facility and eventually the permanent closure of the station. Mrs. Langlois very prudently wanted to see how her business was going to be affected both during and after construction resulting from the expropriation. Under the circumstances presented herein, a verbal extension of the lease had the same effect as a formally executed written lease, especially since the terms and conditions of the verbal extensions were the same as for the written lease and in lieu of the available written three year lease. These extensions, under the circumstances presented in the instant case, just as effectively constituted a "lease agreement" as a formally executed written lease.
Mrs. Langlois also urges that she should receive damages for profits lost subsequent to April 30, 1981. Although Mrs. Langlois *1196 should be compensated for all the damages which occurred during the time she had this station leased and which resulted from the expropriation, these damages cannot extend beyond April 30, 1981, the date on which the last extension expired and Mrs. Langlois permanently closed the station. Any damages beyond that date, under the circumstances presented herein, would be speculative. Further, Mrs. Langlois testified that Exxon had offered her a choice of other business locations which she refused. She terminated her association with Exxon of her own choice. Therefore, she cannot be compensated for speculative damages which may have occurred after April 30, 1981.
In determining the amount of damages, the trial court relied upon the testimony of Dr. George Rice, Chairman of the Department of Economics at L.S.U., and used Dr. Rice's method of calculation to determine profits lost from November, 1979 through July, 1980. Dr. Rice testified as to profits lost from November, 1979 through April, 1981. Dr. Rice stated that his opinion was based upon an examination of Mrs. Langlois's tax returns for the years 1977-1981, information as to the station's gallonage sales during that period of time, and national data concerning gasoline sales in Louisiana supplied by the United States Department of Energy. He also relied on Mrs. Langlois's monthly business income and expense statements.
Dr. Rice took the sales that Mrs. Langlois actually made from December 1979 through April 1981, and compared them with the average sales in all of Louisiana during the same period. He arrived at the conclusion that on the average for this period, Mrs. Langlois had about 20,655 gallons per month "short fall". In other words, her sales per month were 20,655 gallons per month less than the gasoline market in the rest of the state. He then computed the profit she might have made on each gallon that was sold. He looked to her tax returns for the years 1977-1980 to ascertain her profit and then divided her profits by the total gallons sold over the same period to find that her average profit computed on a per gallon basis was 4.84 cents. By multiplying a loss of 4.84 cents per gallon by 20,655 gallons per month for a period of 17 months, Dr. Rice determined that Mrs. Langlois's total loss in profits for the period of December 1979 (commencement of adverse effects from construction) through April 1981 (last extension of Mrs. Langlois's lease) was $16,995.00.[4] We agree that this *1197 was the proper way to determine Mrs. Langlois's loss resulting from the expropriation.
The State argues that there were causes for a decline in sales other than the construction and that these causes should have been considered. The State further contends that the overall decline in business activity beginning in 1978 indicates that the construction, which began in November 1979, had little or no effect on the decline in sales. Apparently, the trial court was convinced that the preponderance of the evidence established that the expropriation was the basic cause of the decline in sales. We agree and a thorough examination of the record convinces us that Mrs. Langlois established her loss as a result of the expropriation in the amount of $16,995.00. The judgment of the trial court is hereby amended accordingly.
The State of Louisiana also argues that the court erred in awarding excessive expert witness fees. The State relies on State, Through Dept. of Highways v. Champagne, supra, as authority for the proposition that the Court is not bound to award as an expert witness fee the amount actually paid by a party. However, the trial court is allowed much discretion in setting expert fees so long as the fee is reasonable and in line with awards made by *1198 other courts in similar cases. Dr. Rice testified that he put in approximately 15 hours on this case not counting his court timeat $60.00 per hour. Dr. Burford testified that he had worked 20 hours at $50.00 per hour and that he charged $450.00 for the court appearance. The trial court awarded him an expert witness fee of $1,450.00. After reviewing the record, we are of the opinion that the trial court did not abuse its discretion.
For the above and foregoing reasons, the judgment of the trial court in favor of intervenor, Jo Carolyn Langlois, and against the petitioner, State of Louisiana, Department of Transportation and Development, be and the same is hereby amended to increase the amount thereof from the sum of $8,482.73 to the sum of $16,995.00 with interest thereon at the legal rate from the date of taking until paid, plus 25% attorney fees. The expert fee of Dr. George Rice is affirmed at $900.00 and the fee of Dr. Roger Burford is affirmed at $1,450.00. The State is taxed with court costs in the amount of $3,315.72.
AMENDED AND AFFIRMED.
NOTES
[1] Art. 1, Sec. 4 of the 1974 Louisiana Constitution provides as follows:

§ 4. Right to Property
"Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable attorney statutory restrictions and the reasonable exercise of the police power.
"Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise. However, a municipality may expropriate a utility within its jurisdiction. Personal effects, other than contraband, shall never be taken.
"This Section shall not apply to appropriation of property necessary for levee and levee drainage purposes."
[2] An issue before the court was whether the replacement costs of a new loading area was an appropriate method to calculate an amount to fully compensate the owners for their losses. The State had suggested business losses should be proved by income figures of the owners' businesses, from which a capitalized value of their economic operations might be found and from which capitalized value the percentage of (or entire) loss of their business income might be ascertained (or rather, estimated). The court said that the constitution does not specify any method by which to determine compensation and does not require compensation by a capitalized-income approach to valuation.
[3] See also 35 La.L.Rev. 18 (at p. 16)
[4] Dr. Rice testified as follows:

"Q. And what information or data were you supplied with or did you compile?
A. The information I was given initially were her tax returns for the years in question, that is the years in which she ran the service station. I was also given information with regard to the sales, the gallons sold of that particular station, even going back prior to her husband's death in 1977. I was also given information with regard to the particular dates involved, namely the date of Mr. Langlois' death, when work began, basically when it was completed, and then ultimately when she got out of the business of running this particular station. So those were the data that formed a basis for the work that I did.
Q. Did you also make use of national data concerning gasoline sales supplied by the Department of Energy?
A. Well, primarily as it applies to Louisiana. That was not a document particular to Miss Langlois, but one that is readily available to anyone.
Q. Were you alsoDid you also make use of Louisiana information concerning Louisiana gasoline sales and gasoline sales tax receipts?
A. Well, I have looked at both of those, yes, sir. The gasoline sales in Louisiana were collected from that former document, which is published by the U.S. Government.
Q. Were you also supplied with her monthly business expense and income statements? Did you have a chance to review those?
A. I reviewed those, yes, sir.
Q. What procedures did you use in evaluating this information?
A. I took the period of time in question, namely from December of 1979, to April of 1981, and took the sales that actually occurred during that period of time. And I needed something to compare those with to find out if there was something abnormal about that period, realizing of course that gasoline sales can change. I just didn't take the year before or two years before or an average of several. But rather, finding out how Louisiana gasoline sales were actually going during that period of time. For example, in January of '80, gasoline sales in Louisiana fell 18.7%. So it wouldn't be proper to say, well, Miss Langlois could have done in '80 of January, January of '80 what she did in January of '79. That would have been improper. So I used these changes in Louisiana gallon sales to adjust her particular gallonage. In other words, if it fell 18.7% from the year before, I said, well, her market share could have maintained at the same level, so let's decrease what she could have sold because all of Louisiana was losing sales. So I projected through that process what would have been an amount that Mrs. Langlois could have sold had she just maintained parity with Louisiana's tendencies to sell gasoline. Taking those projected amounts, because there was something different as I appreciated it at that period, and namely the constructionTaking the projected versus the average, I'm sorry, the actual, we come up with a difference of gallons that might have been sold during that period of time. On average for this seventeen month period, applying that technique, it seems that around 20,655 gallons per month was her short fall of where she could have been had she just kept up with what was happening throughout the gasoline market in the State.
THE COURT: Per month?
THE WITNESS: Yes, sir, the average per month.
A. The bigger short falls came following well, actually December of 1980, that's when it really started falling off. In February of 1981, Louisiana sales were down 12.9%. So it would have in effect said, well, hers would have been down, but hers were way down compared to that fall. So that's the average. That's the average per month. We move then to the idea of how much profit might she have made on each gallon that was not sold. To get that I took the years '77, for which she ran the station, '78, '79 and '80, took her tax returns under the category called profit, and that includes all of her expenses that she had to pay for advertising or whatever. Divide her profits then by the total gallons that were sold over that period, and we find that her average profit per gallon was 4.84 cents.
Q. Okay. Now, that's not her markup over what Exxon charges?
A. No. That's different. That is in effect what she gets to put in her pocket to pay the bills. I did not have information on her markup over Exxon, but this is from her tax returns what her profit, as I appreciate the way one would look at profit. If I run a business, I take out all of my expenses, including cost of sales. There's two categories. You have got revenue, cost of sales and then other expenses, which are insurance and all of those, advertising, electricity bill and all of that. Then you get a number called profit, as I appreciate profit. And so after all of those deductions as well as these cost of buying the gasoline, the profit per gallon 4.84 cents.
Q. And what did you4.84 cents per gallon?
A. Yes, sir.
Q. And how did you apply that figure?
A. Well, that then in fairly straight forward, given this earlier calculation of seventeen months, an average short fall of 20,655 gallons for each of those months, says that had she had and sold those gallons she would have had $15,995.00 more in profit than she did from December of '79 through April of '81.
Q. So that's from the time construction began to effect her business through the date she closed the station.
A. That's your red lines on your chart, yes, sir. That period is represented by those red lines.
Q. And the economic short fall or profit or her lost profit during that time was what?
A. Well, with that technique, I'm saying that something didn't happen so we are just trying to go back and reconstruct it. With that technique, $16,995.00."