554 So.2d 727 (1989)
Jim HOLLAND, Plaintiff-Appellee,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION, Defendant-Appellant.
No. 20984-CA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 1989.
Writ Denied February 16, 1990.
*728 Bertrand & Soileau by Ronald J. Bertrand, Rayne, for defendant-appellant.
Patricia N. Miramon, Shreveport, for plaintiff-appellee.
Before MARVIN, SEXTON and HIGHTOWER, JJ.
MARVIN, Judge.
In this action that arose when the State purchased from the owner-lessor, in lieu of threatened expropriation for I-49, the property that plaintiff leased for a service station, the State appeals a judgment awarding plaintiff-lessee $102,791 for loss of business profits and about $34,000 in attorney fees.
The State primarily contends that the lessee has no right of action against the State for constitutional compensation because his written lease provides that it automatically terminates if the property is expropriated or is voluntarily transferred in lieu of expropriation during its term.
If the lessee has a right of action, the State alternatively contends that the lessee's evidence of business loss is too speculative to satisfy his burden of proof, that any recovery by the lessee should be reduced *729 for his failure to mitigate damages, and that the attorney fee award should be reduced from 1/3 to ¼ of any award for business loss.
We affirm.

LESSEE'S RIGHT OF ACTION
In 1978, Jim Holland began operating a Texaco full-service gas station on property leased from Texaco, Inc., at the corner of Kings Highway and Southern Avenue in Shreveport. Holland's father, who retired in late 1977, operated the business before Holland.
The first of Holland's four leases with Texaco was for one year (1978). Each succeeding lease was for three years (1979-1981, 1982-1984, 1985-1987). The lease in effect when the State bought the property from Texaco in April 1985 was executed in August 1984, for a three-year term beginning January 1, 1985. The lease was not recorded in the public records.
The State concedes that Holland's claim for constitutional compensation is not defeated by the fact that the lease was not recorded, nor by the fact that the State bought the property in lieu of expropriation. State Dept. of Transp. & Development v. Jacob, 483 So.2d 592 (La.1986); Soma Enterprises v. State, D.O.T. & Dev., 521 So.2d 829 (La.App. 2d Cir.1988), writ denied.
The State's argument that Holland has no right of action is founded on paragraph 17 of the lease:
In the event of an appropriation of all of the leased premises, this lease shall immediately terminate by limitation and be of no further force or effect as of the date the premises are actually physically occupied by the condemnor.
The lease defines "appropriation" to include a voluntary transfer "made in lieu or avoidance of an exercise of the power of eminent domain." It also provides that in the event of an "appropriation,"
lessor shall be entitled to the entire award including, but not limited to, compensation, damages, and interest, if any, made with respect to the appropriation, and lessee hereby assigns to lessor all of lessee's interest, if any, in and to all and any part of such award unless ... this lease is terminated as the result of an appropriation and an award is made specifically for loss of business opportunity or goodwill, in which event lessor shall fairly apportion such award between lessor and lessee. (Our emphasis.)
The State does not contend that its payment to Texaco for property included any amount for "loss of business opportunity." The State concedes that, as a general rule, lessees of property taken by the State may claim compensation for business loss under Art. 1, § 4 of the 1974 Louisiana Constitution. State, Dept. of Transp. & Dev. v. Exxon Corp., 430 So.2d 1191 (La.App. 1st Cir.1983), writs denied.
The State argues, however, that Holland has no right of action to claim compensation for business loss through the end of the lease term because he agreed to the resolutory condition in the lease that the lease would terminate "immediately ... in the event of an appropriation," citing State D.O.T. & Development v. Orleans Oil, 520 So.2d 1163 (La.App. 3d Cir.1987), writ denied.
In Orleans Oil, the lessees intervened in the expropriation proceeding against the landowner to claim "compensation for the loss of their leasehold interest." The appellate court affirmed a judgment sustaining an exception of no right of action, filed jointly by the landowner and the State. The court noted that the 1979 lease had an initial six-month term, after which it was to continue "until terminated by either party upon notice in writing given at least ten days prior to effective date of termination."
In 1984, the lessor, Orleans Oil Company, gave the lessees notice that "it is now virtually certain that the State will go forward with the expropriation ... [and that] effective upon the date of any such taking,... all ... leases ... Orleans has with you shall terminate."
The State's petition for expropriation was filed two weeks after Orleans Oil *730 mailed the termination notice to the lessees. The court found that the lease terminated at that time as the State went "forward with the expropriation."
The resolutory condition occurred and the lease obligation came to an end. That the taking was not complete until [the State deposited its estimate of compensation in the registry of the court a few days later] is of no moment.... [I]ntervenors are protected by no lease whatsoever for ... the lease terminated upon DOTD initiating the expropriation proceeding. 520 So.2d at 1164-1165.
In a footnote following this text, the court noted that elsewhere in the lease, the parties agreed that the lease "shall automatically terminate ... if Lessor's estate in said property shall for any reason terminate (whether due to the acts of Lessor or otherwise) during the term of this lease[.]" The court found this provision to be consistent with CC Art. 2697, which provides in part that the lease "is at an end" if the property is taken for a public purpose during the lease term. The footnote ends with these remarks:
Therefore, even if Orleans had not notified Intervenors of the termination of the lease upon the State going "forward with the expropriation" (June 28, 1984), the lease would have terminated under the afore quoted "self-destruct" clause on July 3, 1984, at the moment the State deposited the estimate in the registry of the court. See LSA-R.S. 48:445. Without a lease, Intervenors lack a legal interest in the suit. Fn. 2, 520 So.2d at 1165.
The reasoning in the Orleans Oil footnote follows, without citing, State Department of Highways v. Sumrall, 167 So.2d 503 (La.App. 1st Cir.1964), writs denied. There, the court reversed an award to the lessee of the expropriated property with this brief discussion:
The lessees in [this] case ... are not entitled to recover any amount for the reason that their written and recorded lease contains the following language:
"In the event said premises are either taken for public purposes or the zoning is changed so as to prohibit the premises being used for a service station, then and in those events, this lease is automatically cancelled; provided, the above events are actually accomplished." 167 So.2d at 509.
Sumrall, of course, was decided before our constitution was effective on January 1, 1975, and is not authority for resolution of the claims of a lessee whose leased property is taken or purchased by the State after that date. See Jacob and Soma Enterprises cases cited supra.
CC Art. 2697 provides:
If, during the lease, the thing be totally destroyed by an unforseen [unforeseen] event, or it be taken for a purpose of public utility, the lease is at an end. If it be only destroyed in part, the lessee may either demand a diminution of the price, or a revocation of the lease. In neither case has he any claim of damages.
This article, governing the relationship between the lessor and the lessee, bars the lessee's damage claim against the lessor [for breach of the lessor's obligations to the lessee under CC Arts. 2692-2696], but does not bar the lessee's claim against the condemnor for the constitutionally mandated "just compensation" for the taking. State, through Dept. of Highways v. Champagne, 371 So.2d 626 (La.App. 1st Cir.1979), reversed in part on other grounds, 379 So.2d 1069 (La.1980).
With or without a "self-destruct" clause, a lease terminates by operation of law under CC Art. 2697 if the leased property is taken for a public purpose. By expressly agreeing that the lease will end if the property is taken, the parties merely restate, without changing, the legal effect of the taking that is established in Art. 2697.
In the light of Champagne, Jacob, and Soma Enterprises, we believe it would be unjust and incongruous to hold that a lessee gives up his right to claim constitutional compensation for the taking by agreeing to a "self-destruct" clause that merely restates the law governing the relationship between himself and his lessor.
*731 All leases, whether oral or written, recorded or unrecorded, and with or without a "self-destruct" provision, terminate when the leased property is "taken" for a public purpose under Art. 2697 unless the parties somehow artfully otherwise provide in the lease.
We cannot reason, as the State argues here and as the court reasoned in Orleans Oil, that a lessee whose lease is terminated because of the taking has no legal interest or right to claim the constitutional compensation. That would be reasoning that the lease terminates because of the taking and that because the lease has terminated, the lessee has no right to claim compensation. Such paralogistic reasoning would preclude claims against the State by lessees under all circumstances [unless a lessor and lessee could somehow agree contrary to C.C. Art. 2697 that the lease will remain in effect after the taking].
Similar reasoning and the conclusion that the lessee had "no right" to claim the constitutional compensation [in Jacob, because the lease was unrecorded and had no effect against the State, and in Soma Enterprises, because the State did not "appropriate" the leased property, but "bought" it], have been squarely urged and rejected.
The intent of the constitution has been squarely held to broaden both the class of persons who may claim the compensation and the measure of the compensation to be awarded. A lessee whose lease terminates, according to law because of the taking, is within the broadened class of persons. See Exxon, Jacob, and Soma Enterprises, cited above. Compare State, Department of Highways v. LeBlanc, 319 So.2d 817 (La. App. 1st Cir.1975), and Lafayette Airport Commission v. Roy, 265 So.2d 459 (La. App. 3d Cir.1972), writs denied, U.S. cert. denied.
Notwithstanding the denial of writs in both cases, we respectfully decline to follow Orleans Oil and Sumrall, cited above, in support of the State's argument. Writ denials have no precedential value and are not to be construed as approval by the supreme court of the reasoning in the appellate court's opinion. South Central Bell Tel. Co. v. Traigle, 367 So.2d 1143, 1150 (La.1978); St. Tammany Manor v. Spartan Bldg. Corp., 509 So.2d 424, 428 (La.1987).
A lessor and lessee, of course, may agree how the compensation paid by the State for the taking will be divided between them. Their agreement, however, does not reduce the amount the State owes as compensation for the full extent of the loss caused by the taking. See and compare Exxon, supra, 430 So.2d at 1194, and Champagne, supra, 371 So.2d at 636. Holland's assignment to Texaco of his interest in any compensation paid for the taking expressly excludes his "fair share" of an award for "loss of business opportunity or goodwill" and does not avail the State.
As part of its argument that Holland has no right of action, the State contends that Holland
knew when he entered into the last lease covering the years 1985 through 1987 that the property might be purchased or expropriated by the State and that he might not be able to finish the term of the lease.... [W]hen Holland entered into his last lease in August of 1984 and agreed that the lease would terminate under the provisions of Paragraph 17 when the premises were physically occupied by the State, he was well aware that he would not have use of the leased premises through the end of 1987. Thus he cannot recover any damages past October 2, 1985 [the date the State took possession of the property].
Holland knew there was a possibility the property would be taken for highway construction as early as 1983. The State was then investigating two different corridors for the location of I-49 through Shreveport. Holland said he did not learn which corridor had been chosen until he received Texaco's letter in January 1985, five months after he executed his last lease, notifying him that Texaco had agreed to transfer the property to the State in lieu of expropriation and that Holland's lease and Texaco franchise would end when the property was transferred.
*732 Holland's "general knowledge" of the State's plan for the construction of I-49 does not bar his assertion of his validly-acquired rights in property that was later taken for a public purpose, absent a showing by the State that he acted unconscionably or in bad faith. See State Dept. of Highways v. Vermilion Develop. Co., 258 La. 1159, 249 So.2d 167 (1971), U.S. cert. denied; Parish of East Baton Rouge v. Landrum, 289 So.2d 215 (La.App. 1st Cir. 1973), writ denied.
The lease Holland signed in August 1984 was his third three-year lease with Texaco since 1979. Holland's father had operated a service station in the general vicinity for more than 20 years, serving a loyal clientele. From a location less than a mile away, Holland's father moved to the Kings Highway-Southern Avenue Texaco location two years before he retired in 1977. Holland's operation followed that of his father. This record does not suggest that Holland acted unconscionably or in bad faith by renewing his lease with Texaco to continue what we deem was a "family business." We hold that Holland's knowledge of the possibility that the property would be taken for highway construction when he executed the lease in August 1984 does not bar his claim for constitutional compensation.

BUSINESS LOSS
The trial court awarded Holland $102,791 for his business loss for the lease term that ended December 31, 1987. The State questions the sufficiency of the evidence on which the award was based. The court found Holland's claim for business loss after 1987 to be speculative because Holland had no option or guarantee that his lease would have been renewed. Holland has not appealed or answered the appeal to increase the award.
The State contends that Holland's evidence of business loss through the end of 1987 is also speculative. The State made the same contention in the trial court, relying solely on its cross-examination of Holland and his expert witness and its argument in a post-trial brief. We adopt and paragraph the trial court's answer to the State's argument which is made here on the appeal:
On August 6, 1984, plaintiff entered into a new lease with Texaco. This lease was to be effective January 1, 1985 and extend through December 31, 1987. On April 8, 1985, Texaco executed a voluntary Act of Sale, transferring the leased premises to the State of Louisiana. The sale was recorded on June 13, 1985. Plaintiff operated the station with full service until the end of July 1985 at which time Texaco removed the tanks and pumps. Plaintiff continued to operate his Jartran trailer rental business and do repair work out of the facility until October 2, 1985....
The State argues that based upon State Department of Transportation and Development v. Tynes, 433 So.2d 809 (La.App. 1st Cir.1983), plaintiff has proven no damages because he failed to show through acceptable evidence that he was unable to place himself in the same pecuniary position at another location.
The Court concludes that the evidence supports a finding that [the] plaintiff's service station was in a unique and strategic business location. The station was located on Kings Highway and Southern Avenue, a high traffic area with both residential and commercial customers. There were no other full service stations located in the immediate vicinity. The station's large size allowed plaintiff to provide gasoline sales, full service mechanical bays, and the only Jartran truck and trailer rental business in the geographical area.
The Court finds plaintiff's testimony at trial that he was unable to find a comparable station to which he could relocate to be credible. He further testified that after extensive searching, he found only highly competitive, high rent alternatives which were substantially smaller than his Kings Highway station and unable to support full service and Jartran rental.
The State offered no evidence to counter this testimony.

*733 The Court finds that plaintiff's uncontradicted evidence shows that he was unable to place himself in the same pecuniary position at another location and, therefore, defendant's argument is without merit.
Holland testified that a DOTD employee assisted him in his effort to relocate after the taking in June 1985. The State did not call that employee or other witnesses to refute Holland's testimony, found credible by the trial court, that a suitable alternative location was not available.
The evidence shows that Holland's business profits were based on the desirable combination of a full-service station, in a location with an established clientele who lived or worked nearby, and the truck-trailer rental business from which Holland earned commissions and generated gas sales and vehicle repair work.
According to Holland, the alternative location suggested to him by the DOTD employee was a self-service station several miles away, near I-20 in west Shreveport, that was then under a lease to someone else. This self-service station was about half the size of Holland's Kings Highway station and the monthly rent was about twice what Holland had been paying Texaco.
In the opinion of Holland's economic expert, Dr. Harju, a service station along I-20 would not support the Jartran truck-trailer rental business as well as the Kings Highway location did, and Holland could not have earned as much from either the rental business or a self-service station alone as he earned from combined rental and full-service business at the Kings Highway location. Dr. Harju and Holland, who is an experienced mechanic, testified that the full-service facility filled a void in the self-service market that was prevalent in the area by offering vehicle servicing and repair in addition to selling gasoline.
Dr. Harju's calculations of Holland's business loss during the lease term were summarized by the trial court:
Dr. Melvin W. Harju of Louisiana State University-Shreveport, an expert in the field of Economics and Finance, was the only expert witness who testified at trial.
Dr. Harju testified as to profits lost from June 1985 through December 1987 by plaintiff. Dr. Harju stated that his opinion was based upon an examination of plaintiff's income tax returns for 1982, 1983, and 1984, along with an examination of plaintiff's monthly profit and loss statements for 1983-1985. According to plaintiff's tax returns, his stated net profit in December 1984 was $44,466.00. In June of 1985, a downturn was observed and plaintiff's net profit was $18,042.00.
Assuming that the remainder of the year 1985 would have continued as it had existed in June, Dr. Harju projected the expected net profit for 1985 to have been twice June's profits or $36,084.00. Instead of obtaining a total profit for the year of 1985 of $36,084.00, Dr. Harju found that an actual loss was incurred of $8,157.00. Thus, he arrived at the conclusion that during 1985, plaintiff actually sustained a $44,241.00 loss.
In order to determine the lost profit for the next two years, Dr. Harju took the average net profit of 1984 ($44,466.00) and what he projected for 1985 ($36,084.00), and averaged those two years. He concluded that the lost profit would have been $40,275.00 for 1986 and another $40,275.00 for 1987.
Adding those losses to the loss that was actually sustained in 1985 ($44,241.00), Dr. Harju determined that plaintiff's total loss in net profits for the period of January 1985 through December 1987 (the end of the leasehold period) was $124,791.00. Dr. Harju then reduced this $124,791.00 figure by the amount of plaintiff's [average] earnings to date plus the expected earnings to the end of 1987, an amount of $12,000.00. Dr. Harju concluded that the actual losses sustained by plaintiff through the end of the lease period were $112,791.00.
The court credited the State with $10,000, the amount it paid Holland "in lieu of moving expenses" after he left the Kings *734 Highway station, reducing Holland's award to $102,791.
Notwithstanding the State's argument below that Holland's evidence was too speculative to justify an award for business loss, the trial court found that Holland proved he could not place himself in equivalent financial circumstances at another location, and accepted Dr. Harju's testimony as to the amount of the loss. The State relied solely on its cross-examination of Dr. Harju, in which the State raised the same challenges to his testimony that it raises on appeal.
On this record, we find no error in the trial court's acceptance of the testimony of Holland and of Dr. Harju. Notwithstanding arguable shortcomings in the quality of Holland's evidence, there is no evidentiary basis to disturb the business loss award, which is based on the trial court's assessment of the facts of this particular case and the uniqueness of Holland's business that was lost in the taking. See and compare City of Shreveport v. Standard Printing Co., 427 So.2d 1304 (La.App. 2d Cir.1983), and State, Dept. of Transp. & Devel. v. Pipes, 489 So.2d 293 (La.App. 4th Cir.1986), writ denied.

MITIGATION OF DAMAGES
The State contends Holland's recovery should be reduced because he failed in his obligation to mitigate his damages. In this respect the State argues that Holland stayed at the Kings Highway station for two months after Texaco removed the gas tanks and pumps, he then went into the "risky" wrecker service business for a few months, and he did not resume steady work until about seven months later, when he began working as a mechanic at a service station where he earned commissions on the labor he performed.
After the gas tanks and pumps were removed about August 1, 1985, Holland continued to repair vehicles and to rent trucks and trailers at the Kings Highway station until October 2. His business records from prior years show that rentals were substantially higher in the second half of each year than they were in the first half.
Although Dr. Harju admitted it was "hard to say" whether Holland should have left the property sooner, he acknowledged that Holland's availability to do repair work was important to maintain customer loyalty at a time when Holland did not know whether he would be able to relocate in the same area, and that Holland had to pay his employees to continue the repair work and the truck rentals.
Holland was hospitalized for a few weeks after he left the property in October 1985. In December, he bought a wrecker and resumed the truck rental business, without financial success. He sold the wrecker and stopped the truck rentals in May 1986 when his business partner's wrecker was damaged in an accident. Explaining that he then began looking for work as a mechanic, and expressed his willingness to work for mechanic's pay, Holland said he had trouble finding someone who would hire him because he "knew as much as they did ... And they felt ... they couldn't pay me what ... they thought I was worth, and they weren't going to insult me with paying me a minor figure."
In December 1986, Holland was hired as a mechanic at a newly opened service station. He was paid commissions on the labor he performed. His income varied because the station was new. He told Dr. Harju his income averaged $1,000 per month. At trial in September 1987, he said he earned $300-350 per week, or about $1,300 per month. Dr. Harju admitted these figures were higher than the estimate Holland had given him earlier, but used $12,000 as the estimate of Holland's 1987 earnings because he considered $1,000 a reasonable monthly average in a new business where income fluctuates from month to month.
The trial court accepted $12,000 as the amount by which Holland's yearly business-loss recovery should be reduced. The State did not present any evidence to show that Holland could or should have earned more money sooner than he did after he left the Kings Highway station. Under the *735 circumstances with which Holland was faced, the evidence does not show that he acted unreasonably in remaining at the station for two months after the gas tanks and pumps were removed, or in his efforts to earn income thereafter. The acceptance of the $12,000 reduction is not an abuse of the trial court's discretion.

ATTORNEY FEES
Holland prayed for 25 percent attorney fees. The trial court's initial reasons for judgment made no attorney fee award but stated, "The applicability of LSA-R.S. 48:453(E) to the issue of plaintiff's entitlement to attorney's fees must be docketed for argument on a contradictory rule to show cause." Holland provoked the rule and again asked for 25 percent attorney fees.
For reasons rendered orally and not transcribed or presented in this appellate record, the trial court awarded Holland $33,921 in attorney fees, slightly less than 1/3 of the $102,791 business loss award. The court obviously based the attorney fee award on LRS 13:5111, which allows recovery of "reasonable attorney fees actually incurred" by the plaintiff in a proceeding against the State for compensation for the taking of property other than through an expropriation proceeding, rather than on LRS 48:453 E. This latter statute allows "reasonable attorney fees" in a quick-taking action by the State under LRS 48:441 et seq., if the amount of compensation deposited in the registry of the court is less than the amount awarded in the judgment. Under § 453 E, the attorney fee award "in no event shall exceed twenty-five percent of the difference between the award and the amount deposited in the registry of the court." Of course, there was no quick-taking action or deposit in the court registry made by the State.
The State admitted at oral argument that its request for a reduction of the attorney fee award to 25 percent is not based on the statutory cap under § 453 E, but solely on the fact that Holland should be bound by his pleadings, both before and after trial, in which he prayed for 25 percent attorney fees.
The hearing to determine the attorney fee award was held not only to fix the amount, but also, in the words of the trial court, to determine the applicability of LRS 48:453 E to the attorney fee claim.[1] The State had "fair notice" of this issue. Townsend v. Cleve Heyl Chevrolet-Buick, Inc., 318 So.2d 618 (La.App. 2d Cir.1975).
The State does not contend that the award exceeds the "reasonable attorney fees actually incurred" by Holland, but only that the award exceeds the percentage prayed for by Holland. Without a transcript of the hearing on the rule about the attorney fee issue, we cannot deduce what the evidence was or whether the pleadings were enlarged by evidence. See CCP Art. 1154; Cheatham v. Lee, 277 So.2d 513 (La. App. 1st Cir.1973), writ denied.
An appellant must provide us with a transcript of the proceedings that result in a judgment from which he seeks appellate relief. CCP Arts. 2130-2132; State through DHHR v. Simmons, 521 So.2d 749 (La.App. 2d Cir.1988). Under these circumstances, we simply have no basis to disturb the attorney fee award.

DECREE
At the cost of the State allowed by statute, the judgment appealed is AFFIRMED.
NOTES
[1] Holland's counsel stated at oral argument, and the State's counsel did not deny, that it was the State, and not Holland, who called the court's attention to LRS 13:5111, which provides in part:

A court of Louisiana rendering a judgment for the plaintiff in a proceeding brought against the state of Louisiana ... for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding.