FORET, Judge.
This is an expropriation proceeding in which both the defendant, Standard Printing Company, Inc. (Standard Printing), and the plaintiff, The Redevelopment Agency for the City of Alexandria, Louisiana (Agency), appealed the judgment of the trial court awarding defendant: $7,000 for the leasehold advantage; $55,000 for moving expenses, damages, and loss of profits; attorney’s fees in the amount of $15,500; attorney’s expenses in the amount of $2,000; expert witness fees to Robert A. Wolf, $3,500; T.M. Clauretie, $4,500; and Marvin Juneau, $3,500.
FACTS
The trial court judge has set out a summary of the facts in his well-written opinion, from which we quote:
“This expropriation proceeding involves the taking of a building (frequently referred to in these proceedings as the “Thigpen building”), and land owned by the heirs of J.B. Thigpen (who are defendants Dorris Thigpen Snell Drum-mond and Minnie Lou Harding Gremil-lion) generally referred to as “the owners”, and leasehold interests owned by defendants Standard Printing Company, Inc. and H & H Moving and Storage Company, herein referred to as “lessee”, for the purpose of developing a hotel-civic center complex. This particular property is among many other properties expropriated in a four block area in the old downtown section of Alexandria, bounded on the north by Main Street (next to and parallel with Red River), on the east by Jackson Street, on the south by Fourth Street, and on the west by Fisk Street. Most of the buildings in this area were built in the 1920s or 30s, and were of basically sound brick and wood construction typical of that era. The immediate area had suffered the customary blight of many older downtown properties, and at the time of taking (stipulated to be the date of December 6,1982) many of the buildings were in a state of substantial disrepair, some of them were *126 vacant, and others were not utilized to their best potential. However, in areas adjoining this neighborhood (except the river side) considerable renovation of old buildings and construction of some new buildings are evident, primarily in the nature of governmental, business and financial buildings, along with religious and medical facilities.
“The property in question consisted of approximately one-third of an acre on which were three two story buildings, one of which was leased to and occupied by defendants Standard Printing Company, Inc. (“Standard Printing”), another was rented to and occupied by defendant H & H Moving and Storage Company, Inc. (“H & H”), and the third building was unoccupied at the time of the taking. The Standard Printing Company lease would have by its terms expired on December 31, 1986, at a rental of $300.00 per month.”
SPECIFICATIONS OF ERROR
Appellant, Standard Printing, contends that the trial court erred as follows:
(1) In disregarding the expert testimony establishing the amount of lost past and future profits allegedly caused by the expropriation through the balance of the lease term;
(2) In determining that the leasehold advantage had a value of only $7,000;
(3) In failing to award attorney’s fees in the amount of $89,964.07.
Appellant, Agency, contends that the trial court erred as follows:
(1) In concluding that Standard Printing was entitled to recover lost profits;
(2) In holding that the expropriation caused Standard Printing to sustain a business loss;
(3) In failing to allow the Agency credit of $24,042; and
(4) In fixing the expert witness fees of Robert A. Wolf, T.M. Clauretie and Marvin Juneau.
WAS THE AWARD FOR LOST BUSINESS PROFITS APPROPRIATE, AND IF SO, SUFFICIENT?
Standard Printing conducted its printing operations in both the Thigpen building and the Wettermark building. Mr. Landry, the owner and president of Standard Printing, housed his office and the general offices, bookkeeping, composition letter-press operation, all machinery and equipment, paper cutter, and walk-in customer sales area in the Wettermark building. The Wetter-mark location was essential to the operation of the business. The lease agreement on the Wettermark property terminated on December 31, 1981. A new lease was never signed, although Alfred Wettermark testified he would have negotiated a new lease for $400 per month, an increase of $160 per month.
Standard Printing had no leasehold right to the Wettermark building after December 31, 1981. That is the termination date of the lease. A lessee without a lease term has no claim for business losses. State, Dept. of Transportation & Development v. Manuel, 451 So.2d 659 (La.App.3 Cir.1984). An award for lost profits after a lease expiration is too speculative to allow recovery. State, Dept. of Transportation & Development v. Exxon Corp., 430 So.2d 1191 (La.App. 1 Cir.1983).
Standard Printing alleges that they could have obtained another lease of the Wetter-mark building but for the redevelopment project. However, the uncertainty of the project persuaded Mr. Wettermark to consider a new lease to Standard Printing. Furthermore, after the termination of the lease, Standard Printing paid $250 per month instead of $400 per month.
Standard Printing additionally argues that it could have moved its general offices, etc. to the Thigpen building and the retail sales building. However, the record reflects that the Thigpen building was a dilapidated and deteriorating building, not suitable for that purpose. Safety hazards prevailed in the Thigpen building.
Mr. Landry knew that Mr. Wettermark sold the building to the Agency and admit *127 ted in his deposition that it was not possible to relocate from Wettermark to Thigpen. The Wettermark building was an integral and essential part of the printing operation’s business. The Agency allowed Standard Printing to remain in the Wettermark building, via several extensions, until October, 1982.
Standard Printing contends that, nonetheless, the Agency failed to give it sufficient time for relocation and therefore, it sustained business losses in the amount of $261,158. The record reflects that this contention is inaccurate.
Between July 21 and July 29, 1983, Standard Printing moved its printing equipment, machinery, and inventory. However, this move took place long after Standard Printing was aware that it would have to relocate.
Standard Printing retained counsel to advise it concerning the expropriation before December of 1980. In 1981, Standard Printing obtained an estimate from Sullivan Transfer Company of the moving expenses for the printing operation and the retail sales. Standard Printing enlisted the assistance of several realtors to find a new location for the business.
Statutory Notice of Displacement was mailed to Standard Printing on August 12, 1982, after negotiations with the owner had been initiated. After providing Standard Printing with such notice, the Agency was obligated under federal regulations to pay reasonable relocation expenses.
The expropriation suit was filed on October 27, 1982, and set for a December 13, 1982 trial. Standard Printing filed a dilatory exception of prematurity, alleging that the Agency failed to enter into “good faith” negotiations. The trial court overruled the exception.
Standard Printing received the statutory Ninety-Day Notice to Vacate on November 5, 1982. During the deposition on November 20, 1982, Mr. Landry acknowledged Standard Printing’s legal obligation to vacate the premises by February 5, 1983. The Agency granted Standard Printing an extension on December 6,1982 from February 5 to March 31 for relocation of the printing operation.
Mr. Landry waited until April 21,1983 to purchase a lot suitable for construction of a new building to be leased by Standard Printing. Landry contends the delay was due to rumors during the mayorial campaign that the project might cease. Landry testified he did not, however, contact the newly-elected mayor to discern the future of the project.
Landry ignored repeated formal notices from the Agency that the project was proceeding as planned. He testified that his independent investigation revealed the last buildings to be demolished would be Thig-pen and Wettermark. Consequently, he concluded that until August 1, 1983, the buildings would not be demolished; in spite of the fact that he testified that the Agency did not represent he had any additional time beyond the March 31, 1983 deadline to relocate.
The record reflects that if action to relocate had been initiated at the time the notice of displacement was mailed on August 12, 1982, Standard Printing would have been relocated with sufficient time not necessitating another extension [2].
In brief, Standard Printing contends that as a result of the eviction proceeding instituted on June 2,1983, it sustained considerable economic loss. Counsel for defendant conceded the Agency’s legal right to evict Standard Printing.
The record reveals that had Standard Printing vacated the premises in accordance with the March 31, 1983 deadline and maintained a safe working place for its employees, the eviction would not have been necessary. The eviction proceeding resulted in a consent eviction judgment on *128 June 13, 1983. While the negotiations precipitating the consent judgment took place, Landry did not claim that eviction would disrupt his business.
Certainly, the relocation was forced, but delay in relocation was not. A disruption in business is a usual consequence of expropriation — however, Standard Printing had a duty to mitigate its damages instead of procrastinating. Much of the disruption appears to be the result of Standard Printing’s failure to mitigate its damages.
In Stanley v. Guy, 442 So.2d 579 (La.App. 1 Cir.1983), the court quoted from Lawyers Title Ins. v. Carey Hodges & Associates, 358 So.2d 964 (La.App. 1 Cir.1978):
“An injured party is required to take reasonable steps and exercise ordinary prudence to minimize his damages. The injured party should exercise a degree of such care as would be taken by an ordinarily prudent individual under the same or similar circumstances. Reasonable care depends upon the circumstances attending each particular case, including time, knowledge, opportunity, exposure to further loss and the expense required to avoid reasonably foreseeable loss.”
Prior to moving Standard Printing to the new location, Landry obtained bids from many contractors for installation of the central air conditioning system, built-in mezzanine, and other items needed in the new building. However, up to the fourth day of trial, Landry had taken no steps to have the air conditioning system, mezzanine, or shelving in the building installed. During a deposition on May 30, 1984, Landry stated he would have been able to begin business on a limited basis if the air conditioning, necessary electrical, and calibration of the machines and lighting for the mezzanine had been completed. However, at trial Landry recanted his testimony during the deposition. Landry claims that a delay on the part of the Agency in providing the necessary funds to pay the electrical contractor is the reason the air conditioning system was not installed. However, Landry was aware of the procedures the Agency had to follow before actual payment was provided for relocation expenses.
Standard Printing had been paid a total of $240,005.14 by the Agency for the following:
A. Tenant owned real property im-provements_ $62,622.00
B. Moving machinery and equipment (Sullivan Transfer)_ $123,986.00
C. Electrical disconnection and reconnection. 28,200.00
D. Telephone relocation_ 378.50
E. Installation of exhaust hoods_ 10,794.00
P. Installation of air lines from air compressor. 1,175.00
G. Reprinting printed material_ 6,113.64
H. Installation of gas lines to four machines. 1,800.00
I. Installation of developing_ 1,436.00
J. Maximum allowable for relocation search expense_ 500.00
TOTAL.$240,005.14
It is obvious that Standard Printing knew it would receive some funds from the Agency and could have borrowed the necessary funds to pay the electrical contractor and wait for reimbursement from the Agency.
Standard Printing, through its expert, T.M. Clauretie, concluded that a precipitous drop in printing sales at the end of May of 1983 was linked to the forced move. Dr. Clauretie averaged the monthly printing sales for the period from January, 1979 through May, 1983, and arrived at an average monthly printing sale figure of $40,-667. However, the record reflects that the last month Standard Printing had more than $40,000 in printing sales was September of 1982. Dr. Clauretie relied upon corporate records to compute his figures. He apparently disregarded the 60-day period between the sales date and date of reflection on the appropriate ledgers of the corporation. Sales reflected on the corporate sales ledgers between the months of May and June of 1983 would actually have occurred between the months of March and April of 1983. Additionally, Dr. Clauretie concluded that Standard Printing was not operating at all at the old location by June *129 of 1983. In fact, Mr. DeBellevue, the plant manager, testified that they were operational until the time that Sullivan Transfer appeared for the purpose of moving the equipment. Additionally, Dr. Clauretie concluded that Standard Printing was fully operational in the new location by September of 1983. His conclusion is understandable when the corporate sales ledgers are consulted. The actual monthly sales for September of ’83 increased substantially from the August ’83 sales. However, Mr. Landry testified that printing operations were disturbed significantly as a result of the relocation from the middle of June at least through November and possibly December.
The Agency’s expert, Mr. Staples, examined only the sales of the printing department. He did not examine the records to determine whether or not the printing department was profitable prior to the relocation, and whether it lost profits as a conse-quénce of the relocation. Furthermore, Mr. Staples assumed that the eviction in early June, 1983, was totally unrelated to the expropriation.
We believe that the figure of $55,-000 awarded by the trial court for moving expenses, damages, and loss of profits is appropriate. Although an award for lost profits after a lease expiration is too speculative to allow recovery, Standard Printing did have a valid lease on the Thigpen Building which was still in effect. Furthermore, the expert opinion as to value is not binding on the trial court because it is not conclusive — it is generally regarded as an advisory opinion. The trial judge may, instead, make an award in an amount to which no expert testifies since the trial court is empowered to evaluate. He cannot completely disregard the testimony of experts testifying when that testimony is well grounded from the standpoint of good reasoning. State, Dept. of Transportation v. Van Willett, 386 So.2d 1023 (La.App. 3 Cir.1980), writ denied, 392 So.2d 692 (La.1980). Because of the much discretion granted to the trial court and the evaluation of and weight to be given to the testimony of each expert witness, his findings will not be disturbed on appeal unless the findings are cleaidy erroneous. State, Dept. of Transportation v. Van Willett, supra, at 1029.
We do not find the award of $55,000 erroneous. Of course, Standard Printing wants five times that amount and the Agency would have them recover nothing. However, it is undisputed that the business was partially disrupted by the expropriation. We find that Standard Printing failed to mitigate its damages and is not entitled to the full amount it claims.
IS $7,000 FOR A LEASEHOLD ADVANTAGE SUFFICIENT COMPENSATION?
Standard Printing has been in the printing business in Alexandria for sixty-six years. The company moved to the Thigpen building in 1926. Standard Printing paid $300 per month rent pursuant to a lease which was not to expire until December 31, 1986.
Robert Wolf was hired by Standard Printing to evaluate the leasehold advantage. Wolf used the market data approach based upon market comparables and concluded that the rental value of the Thigpen building in December, 1982, was $650 per month, equating to a $350 per month leasehold advantage. On the date of expropriation, Standard Printing had forty-eight months left on the lease. Wolf discounted by 12% the value of the leasehold advantage for the remaining term of the lease (48 payments at $350 per month to total $13,291).
The Agency’s appraiser, Mr. Mowad, estimated the leasehold advantage at $157.75 per month or a discounted value of $6,193. Rod Knolls, also hired by the Agency, testified that he agreed with the leasehold advantage determined by Mr. Wolf.
The analysis by Mr. Mowad was not made until July 26, 1984, five days before trial. Certainly the analysis supported the low valuation of the property itself based upon the income capitalization approach. *130 However, the leasehold advantage must be subject to a credit for the additional occupancy by Standard Printing. Considering the dilapidated condition of the Thigpen building and other factors reflected in the record, we believe that the decision of the trial court awarding $7,000 for the leasehold advantage is appropriate and within the trial court’s discretion. For the above mentioned reasons, this specification of error has no merit.
SHOULD THE AGENCY BE GIVEN A CREDIT OF $24.042?
Standard Printing submitted to the Agency, on HUD forms, their claims for expenses of moving property from the acquired site to the replacement site. Pursuant to 24 Code of Federal Regulations[3] 42.305(A)(1), a displaced business is entitled to payment for the “actual reasonable expense” of moving personal property from the “acquired site” to the “replacement site.”
Standard Printing submitted a claim in the amount of $123,986 as the actual cost charged by Sullivan Transfer Company to move the property from the acquired site to the replacement site. The HUD form directed the Agency to pay Sullivan Transfer the sum of $123,986 directly. The Agency issued its check on September 8, 1983, in that amount payable to Sullivan Transfer and Norman J. Landry, Jr. Landry endorsed the check and had it mailed to Sullivan Transfer. Landry did not tell the Agency that on September 2, 1983, an invoice on a Standard Printing form in the amount of $24,042 had been issued to Sullivan Transfer. The Agency was never told that Sullivan Transfer repaid Standard Printing $24,042.
$24,042 of the $123,986 moving payment was deposited in Landry’s personal bank account. Landry testified that he had a personal corporate checking account. He speculated that part of those funds were for his employees who had unpacked some boxes and provided carpentry and security services.
However, the record reflects that the proposal submitted by Sullivan required that Standard Printing pack loose matters in boxes or cartons. The inventory attached to the May 27, 1983 proposal from Sullivan Transfer contains numerous packed-by-owner items. Part of that proposal did provide that Sullivan Transfer would furnish a carpenter to remove the wall for access and would furnish security services. Landry testified that the written proposal submitted by Sullivan was in error. This testimony was admitted despite timely objections by the Agency.
The May 27, 1983 proposal from Sullivan Transfer was for the relocation of the retail store, print shop office and supply warehouse to new location. The record reflects that Sullivan Transfer did not move the retail store, instead it was moved by Standard Printing. The payment of $24,042 by Sullivan Transfer to Standard Printing makes it clear that Sullivan Transfer’s proposal to Standard Printing did include moving the retail store and that in order for Standard Printing to get that money back from Sullivan, Standard Printing sent an invoice to Sullivan Transfer, the purpose of which was to recoup the funds that Sullivan Transfer had not charged because it did not move the retail store.
Standard Printing never represented to the Agency that any self-move would be included in its relocation effort from the acquired site to the relocation site. The Agency argues that it is entitled to a credit off $24,042 for overpayment to Standard Printing for moving expenses.
We believe the record supports the fact that the Agency is entitled to a $24,042 credit. Standard Printing submitted an inflated claim for moving expenses inasmuch as Sullivan Transfer reimbursed Standard Printing $24,042. Furthermore, there is no evidence of actual reasonable moving ex *131 penses—only tenuous speculation in Landry’s testimony. For these reasons, the Agency is entitled to a credit in the amount of $24,042.
DID THE TRIAL COURT ABUSE ITS DISCRETION IN FIXING THE WITNESS FEES OF ROBERT A. WOLF, D.M. CLAURETIE, AND MARVIN JUNEAU?
Standard Printing and H & H Moving retained Robert Wolf to give an opinion on the leasehold value of the property expropriated. The trial court fixed Mr. Wolfs fee at $3,500 for his testimony and preparatory work. Mr. Wolf did not have any itemization of the amount of time he spent working on his appraisal assignment. He testified that customarily he charges $60 per hour. Based on this per hour charge, according to the amount fixed by the trial court, Mr. Wolf would have worked for more than 58 hours. However, the record reflects that the comparables used by Mr. Wolf to reach an opinion on the value of the economic rent were the same comparables used in a report prepared by Mrs. Bordelon, an associate of Mr. Wolf. A total award of $9,000 for the two leasehold estates was granted by the trial court, making Mr. Wolfs fee at $3,500, 38% of the award for the leasehold estates. We believe the trial court abused its discretion and that an award of $3,500 for Mr. Wolfs testimony and preparatory work was excessive.
The trial court made a statement at the close of the trial that Mr. Wolfs testimony did not really add anything. The assessment of a fee for an expert witness must be based on the relative usefulness of his testimony. Melancon v. Oilfield Lubricant Services, Inc., 292 So.2d 908 (La.App. 1 Cir.1974). Preparatory work done by the appraiser that was reasonably necessary to establish the value of the property must be considered. Likewise, the value of the property being taken must be considered. State, Dept. of Highways v. Gordy, 322 So.2d 418 (La.App. 3 Cir.1975), writ refused, 326 So.2d 370 (La.1976). Consequently, we believe that an award of $1,200 is sufficient compensation for Mr. Wolf for the time he spent testifying and preparing.
Dr. T.M. Clauretie was retained by Standard Printing to furnish his opinion on business losses. Dr. Clauretie advised the court that his time and charges totaled $4,182.28. The Agency contends that much of Dr. Clauretie’s testimony should be disregarded and he should be compensated accordingly. The trial court awarded $4,500 to Dr. Clauretie. We believe this amount is somewhat excessive. Dr. Clauretie himself testified that his time and charges were $4,182.28; we reduce the trial court’s award to $4,182.20.
Mr. Marvin Juneau limited his testimony to reviewing the report prepared by Dr. Clauretie. No independent examination of the contents of Dr. Clauretie’s report was conducted by Juneau. Juneau only furnished financial records prepared by Standard Printing’s accounting firm to Dr. Clauretie. The trial court awarded him $3,500. The Agency contends this fee is excessive and unreasonable. After reviewing the record, we reduce the trial court’s award to $2,000.
DID THE TRIAL COURT ERR IN FAILING TO AWARD ATTORNEY’S FEES IN THE AMOUNT OF $89,-964.07?
The trial judge awarded Standard Printing $15,500 as attorney’s fees, and $2,000 as attorney’s expenses. On appeal, Standard Printing argues this award is less than the amount charged for services rendered, in the amount of $89,964.07.
LSA-R.S. 48:453(E) reads:
“Reasonable attorney fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the amount of compensation awarded in the judgment. Such attorney fees in no event shall exceed 25% of the difference between the award and the amount deposited in the registry of the court.”
*132 This provision gives the trial court much discretion in making an award of attorney’s fees.
Between June 29, 1981 and August 8, 1984, Standard Printing’s attorneys billed them for 405V2 hours and out-of-pocket expenses of $4,880.70. The trial court awarded $15,500. This figure represents 25% of the award of $62,000 to Standard Printing, plus a reimbursement for $2,000 of out-of-pocket expenses. In expropriation suits, a trial judge is not required to award attorney’s fees equal to 25% of any excess award. State, Dept. of Transportation and Development v. Van Willett, supra. We interpret LSA-R.S. 48:453(E) as meaning that the trial court has discretion to award up to 25% of the excess award but he is not at liberty to award more than 25% of the excess award. Accordingly, the judgment of the trial court fixing attorney’s fees and expenses is affirmed.
The trial court’s factual determinations as to value of property, evaluation and weight given to testimony of expert witnesses should not be disturbed on review in an expropriation proceeding in the absence of manifest error.
For the reasons assigned, the judgment of the trial court is amended as follows: a $24,042 credit to the Agency; reduction in the expert witness fee of Robert Wolf to $1,200, of T.M. Clauretie to $4,182, of Marvin Juneau to $2,000. In all other respects, the judgment of the trial court is affirmed.
Costs of this appeal are assessed against defendant, Standard Printing Co., Inc.
AFFIRMED AS AMENDED, AND RENDERED.

. Standard Printing could have been relocated by the end of March of 1983. The move was completed on July 29, 1983, four months beyond March 29, 1983. The notice of displacement was mailed August 12, 1982, and an extension was granted on December 6, 1982 — a time period of four months.

. Code of Federal Regulations applies because the City obtained an urban development grant from the U.S. Department of Housing & Urban Development.